IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ERNEST GALLEGOS,

      Petitioner

v.                                            CIV 10-0372 JB/KBM

ERASMO BRAVO, Warden, et al.,

      Respondents.

# PROPOSED FINDINGS
## AND
## RECOMMENDED DISPOSITION

In this habeas action under 28 U.S.C. § 2254, Petitioner Ernest Gallegos challenges his conviction for murder and other offenses. Because he filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), its standards apply to this case. *E.g., AbdulKabir v. Quarterman,* 550 U.S. 233, 246 (2007); *DeLozier v. Sirmons,* 531 F.3d 1306, 1319 (10th Cir. 2008), *cert. denied,* 129 S. Ct. 2058 (2009). The matter is before the Court on the § 2254 petition and Respondents' Answer, as well as the transcripts and other materials from the state court proceedings. *See, e.g., Docs. 1, 9, 12.*[1] All of the issues can be resolved on the record before me, and, therefore, an evidentiary hearing is unnecessary. *E.g., Schriro v. Landrigan,* 550 U.S. 465, 475 (2007); *Sandoval v. Ulibarri,* 548 F.3d 902, 915-16 (10th Cir.

---

[1] Portions of the state appellate record were submitted with Respondents' Answer. For all other citations, I cite the Record Proper or written transcript.

2008), *cert. denied,* 130 S. Ct. 133 (2009); Rule 8(a), RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES DISTRICT COURTS. I recommend that the petition be denied on the merits and the action dismissed with prejudice.

# I.  Overview

A masked intruder committed the murder during a home robbery. The crime was particularly senseless and cruel – both of the victims were bound, compliant, and respectful, eager to part with their possessions so that the assailant would leave them unharmed. Nevertheless, the husband was brutally beaten and left with his entire head encased in plastic and duct tape.

The victims had been renovating their home, and Petitioner was among the subcontractors working there. He assisted a colleague with installing mirrors, and they carried out part of their work in the garage where a large gun safe was in plain view. Though the victims were out of town for much of the renovation, the husband returned some six weeks before the murder to check on the progress of the project. At that time his watch went missing, and he reported the same to his general contractor. Though he later he found his watch and apologized, some of the subcontractors, including Petitioner and his colleague, took offense at the implication that a worker may have stolen the watch. They refused to return to work at the job site.

Immediately after the masked intruder left, the wife managed to free herself and call 911. Officers urgently converged on the neighborhood. Two of them almost hit Petitioner's truck, which was parked by a wall surrounding the gated subdivision where the victims lived. In slowing to miss the truck, the officers noticed Petitioner coming over the wall and entering the

truck.  Finding that suspicious, the officers stopped the vehicle and then observed that Petitioner was wearing black clothing, was sweating profusely, and had a cut on his face.  They checked his registration, kept his driver's license for further investigation, and ordered him out of the truck to detain him for further questioning.

After exiting the vehicle, Petitioner engaged in what the officers believed to be aggressive and resistive behavior, so they maced him.  Despite the mace, Petitioner ran.  He managed to outrun and elude all of the officers in the area, but in doing so left his license and truck behind in the possession of the police.  A search of the area where the truck was parked and where Petitioner came over the wall, they discovered two bags.  Among other things, the bags contained:  the possessions taken from the victims' home; rope; duct tape; wire cutters; a bloody shirt belonging to the husband, later found to match the husband's DNA; a ski mask with a hair later found to match Petitioner's DNA; and gloves later found to have DNA from both the husband and Petitioner.  Fingernail scrapings from the husband also contained Petitioner's DNA.

Eventually, Petitioner was arrested in Mexico and returned to New Mexico for trial. Following a jury conviction on all counts, the New Mexico Supreme Court affirmed his conviction and life-plus sentence. Thereafter, the trial court summarily rejected a *pro se* petition for post-conviction relief.  The New Mexico Supreme Court denied certiorari, and Petitioner timely filed this § 2254 petition.  *See State v. Gallegos,* 146 N.M. 88, 206 P.3d 993 (N.M. 2009); *Doc. 9* at 7-8; *Doc. 9-4* at 1, 17, 19, 41.[2]

---

[2]  The direct appeal became "final" for AEDPA purposes on June 22, 2009.  This is the Monday after the ninety-day period in which Petitioner could have filed for certiorari in the Supreme Court of the United States from the New Mexico Supreme Court's March 23, 2009 decision on direct appeal.  *Doc. 9-3* at 1; *see also, e.g., Gallegos,* 146 N.M. at 91-98, 206 P.3d at 996-1003 (dated April 21, 2009 and characterized as a "substituted" opinion, but identical in substantive part); *Cooley v. Medina,* 2011 WL 6587 at *2 (10th Cir. 2011) (citing *Locke v. Saffle,* 237 F.3d 1269, 1273 (10th Cir. 2001)), *petition for cert. filed 1/31/11.*

# II.  Noncognizable Claims

This Court must construe *pro se* petitions liberally.   *E.g., Erickson v. Pardus,* 551 U.S. 89, 94 (2007); *Haines v. Kerner,* 404 U.S. 519, 520-21(1972) (per curiam); *Hall v. Bellmon,* 935 F.2d 1106, 1110 & n. 3 (10th Cir. 1991).  The petition here contains nine separately-numbered claims that raise multiple and interrelated arguments as grounds for habeas relief.  *See Doc. 1* at 4, 6-9, 11-24.  Below, I address the merits of all of the grounds for relief Petitioner raises.  First, however, I discuss the claims that are not cognizable in federal habeas.

---

Petitioner "verified" that his *pro se* state petition was signed and mailed on October 29, 2009. However, the clerk did not stamp it filed until December 14, 2009, the same day that judge issued his summary denial.  Nothing in the record indicates when the judge received the state petition.  The only notation on it is the handwritten notation that it was "OK to file."  *See Doc. 9-4* at 1, 17, 18.  Because the "prison mailbox rule" is inapplicable in New Mexico, about five months of the AEDPA one-year limitations period elapsed between the date when the direct appeal became final, and the date when the state post-conviction proceedings commenced by the clerk filing the petition.  *See, e.g., Adams v. LeMaster,* 223 F.3d 1177, 1182 (10th Cir. 2000) (holding New Mexico would not recognize a "prison mailbox rule" and effective date of filing in New Mexico for AEDPA statute of limitations purposes is "at the very least, receipt by the clerk;" noting that New Mexico"defines 'filing with the court' as 'filing [pleadings and other papers] with the clerk of the court, except that the judge may permit the papers to be filed with the judge, in which event the judge shall note thereon the filing date and forthwith transmit them to the office of the clerk.'  N.M. R. Crim. P. 5-103D."), *cert. denied,* 531 U.S. 1195 (2001); *c.f., Garcia v. Shanks,* 351 F.3d 468, 472 (10th Cir. 2003) ("Garcia has not guided us to, nor have we found, New Mexico authority that is contrary to our decision in *Adams.*  Moreover, Garcia provides no evidence indicating that the New Mexico district court received his petition any day other than the uncontested date of filing by that court.").

Because Petitioner timely sought and was granted an extension, the federal statute continued to be tolled until the New Mexico Supreme Court denied the petition for certiorari on March 2, 2010.  *See Doc. 9* at 8; *Doc. 9-4* at 20-21 (notice by New Mexico Supreme Court dated December 28, 2009, granting Petitioner until February 12, 2010 to file petition for certiorari, and petition file-stamped January 25, 2010); *Doc. 9-4* at 20, 30, 41 (following court-ordered response, denying petition on March 2, 2010); *see also Lucero v. Tafoya,* 49 Fed. App'x 196, 198 (10th Cir. ) (noting time to file is thirty days under N.M. R.CRIM. P. 5-802G(3):  "In other words, filing of a petition for certiorari in New Mexico must occur within thirty days of the district court's decision and is not subject to the mailbox rule.").

Petitioner moved very quickly to file his federal petition within less than a month, thereby having months to spare on the AEDPA limitations period.  *See Doc. 1* at 1, 29, 39 (§ 2254 petition signed certified as having been placed in the prison mail system on April 5, 2010, postmarked with two labels dated April 13 and 14, 2010, and was received and filed in this Court on April 15, 2010).

## A.  Access To The Courts

Petitioner's first claim asserts that he "is being denied meaningful legal access to the courts" because he "has no access to a law library" as required by New Mexico Supreme Court rule "23-108." *Doc. 1* at 4.  Foremost, by its terms, that rule does not apply to prisoners.  *See* N.M. Rule 23-108 ("supreme court and the district court libraries . . . shall be open to the ***public*** on regular court business days.") (emphasis added).  Also, access to the court claims are not cognizable as a grounds for habeas relief, and instead must be pursued in separate civil action under 42 U.S.C. § 1983.  *E.g., United States v. Brittain,* 41 Fed. App'x 246, 249 n.2 (10th Cir.), *cert. denied,* 537 U.S. 913 (2002).  Any such suit by Petitioner would be unavailing.  As demonstrated by the remainder of these proposed findings, Petitioner cannot establish that the alleged denial of legal resources has hindered his efforts to pursue a nonfrivolous claim in challenging his conviction and sentence. *E.g., Lewis v. Casey,* 518 U.S. 343, 353 (1996); *McPherson v. Miers,* 7 Fed. App'x 845, 849  (10th Cir. 2001).  Accordingly, I recommend that "Ground One" of the § 2254 petition be dismissed.

## B.  Grand Jury Instructions

One ineffective assistance of counsel claim stems from the allegation that the grand jury was not properly instructed on the elements of kidnapping.  *See Doc. 1* at 20-21.[3]  However, only a few limited issues concerning grand jury procedures are subject to federal habeas review.[4]

---

[3]  Trial counsel moved to dismiss the indictment on this ground.  *See Record Proper* at 156, 163-66; *see also id.* at 202, 207-08 (State's response arguing instruction was proper).  The trial judge denied it.  *See Trial Transcript Vol. I* at 7 ("the degree of kidnapping is not necessarily the essential elements of the crime . . . there's no requirement that they present the penalty part of that particular offense").

[4]  One instance is racial discrimination in the selection of grand jury members.  *Rose v. Mitchell,* 443 U.S. 545, 560-61 (1979).

This is generally so because, as the Supreme Court has "stated many times . . . 'federal habeas corpus relief does not lie for errors of state law.'"  *Estelle v. McGuire,* 502 U.S. 62, 67 (1991) (quoting *Lewis v. Jeffers,* 497 U.S. 764, 780 (1990)).  It is also in part because of the long-settled law that "indictment by grand jury is not part of the due process of law guaranteed to state criminal defendants by the Fourteenth Amendment."  *Branzburg v. Hayes,* 408 U.S. 665, 687-88 n. 25 (1972).[5]

The only due process inquiry concerning a grand jury indictment is whether it gives the defendant sufficient notice of the charge – an issue not argued or arguable here.  The kidnapping crime represented by the indictment is identical to the kidnapping crime represented by the petit jurors' verdict.  *E.g., Hain v. Gibson,* 287 F.3d 1224, 1232-32 (10th Cir. 2002), *cert. denied,* 537 U.S. 1173 (2003); *Johnson v. Gibson,* 169 F.3d 1239, 1252 (10th Cir.), *cert. denied,* 528 U.S. 972 (1999); *Record Proper* at 95-95.  And, where, as here, the notice requirement is satisfied, any alleged defects concerning the "sufficiency" of the indictment or the grand jury procedures are essentially moot following a jury verdict of guilty.  In a federal prosecution in *Mechanik,* for example, the Supreme Court noted a federal grand jury rule that "protects against the danger that a defendant will be required to defend against a charge for which there is no probable cause to believe him guilty," and recognized violations of this rule "had the theoretical potential to affect the grand jury's determination whether to indict."  *United States v. Mechanik,* 475 U.S. 66, 70

_____

[5]  *See also, e.g., Jordan v. Commonwealth of Mass.,* 225 U.S. 167, 176 (1912) (citing *Hurtado v. California,* 110 U.S. 516 (1884)); *Williams v. Haviland,* 467 F.3d 527, 5301-33 (6th Cir. 2006) (*Apprendi* did not extend Fifth Amendment right to grand jury indictment to states ); *Cole v. Roper,* 579 F. Supp. 2d 1246, 1274 (E.D. Mo. 2008) ("The Fifth Amendment's grand jury indictment requirement only applies in federal courts and is not applicable to the states, either as an element of due process or as a direct command of the Fourteenth Amendment.. . . .  the Eighth Circuit held that *Ring, Apprendi* and *Jones* mean that the Fifth Amendment requires capital aggravating factors be included in federal indictments . . . but that does not help Petitioner here"), *aff'd.,* 623 F.3d 1183 (8th Cir. 2010).

(1986).  That same protection function and possible outcome is no different from the effect of allegedly faulty grand jury instructions here.  Nevertheless, the Supreme Court denied relief because "the petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt.  Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt."  *Id.; see also, e.g., Knewel v. Egan,* 268 U.S. 442, 446 (1925) ("the sufficiency of the indictment cannot be called in question upon habeas corpus.  Even though an indictment thus drawn might have been found defective upon demurrer or writ of error, it is not so fatal, upon its face, as to be open to collateral attack after trial and conviction").

Following the logic in *Mechanik,* federal courts hold that alleged defects in grand jury instructions or procedures are not cognizable in federal habeas.[6]  New Mexico holds the same under state law.  *See Gallegos,* 146 N.M. at 93-94, 206 P.3d at 998-99 ("'*any question of probable cause is necessarily obviated by a finding of guilt*'") (quoting and adding emphasis to *State v. Ulibarri,* 128 N.M. 686, 997 P.2d 818 (N.M. 2000)).  Accordingly, to the extent Petitioner is raising faulty grand jury instructions as an independent basis for habeas relief, the

---

[6] *E.g. Tisthammer v. Williams,* 49 Fed. App'x 757, 765 (10th Cir. 2002) ("We begin by noting that Tisthammer does not cite a single case granting post-conviction relief based on a claim the petitioner was shackled during grand jury proceedings.  The opinion of the Supreme Court in . . . *Mechanik* . . . most likely demonstrates why there are no such cases.  As was true in *Mechanik,* the jury's finding that Tisthammer was guilty beyond a reasonable doubt alleviates the concern that the grand jury's finding of probable cause to charge was tainted by the shackling."), *cert. denied,* 538 U.S. 928 (2003); *see also, e.g., Lopez v. Riley,* 865 F.2d 30, 33 (2nd Cir. 1989) ("The particular claims of impropriety before the grand jury in this case concern the sufficiency of the evidence, a failure to develop exculpatory evidence by the prosecutor, the presentation of prejudicial evidence and error in explaining the law.  Each of these alleged improprieties was cured in the trial before the petit jury, which convicted.  Under *Mechanik,* therefore, error before the grand jury, if any, was harmless."); *Lucius v. Filion,* 431 F. Supp. 2d 343, 346-48 (W.D.N.Y. 2006) (describing various New York grand jury procedures challenged but held not cognizable).

claim fails.  The associated ineffectiveness claim fails as well, and the reasons why this is so are addressed below in a more detail.[7]

## C.  Claims Related To "Actual Innocence"

The common theme underpinning all of Petitioner's claims is that he is innocent.  On direct appeal, for example, he maintained his "actual innocence," "pray[ed] that the Court will keep this in mind during its review," and asserted that the "[criminal] case arose after Mr. Gallegos initiated a false arrest lawsuit against the Albuquerque Police Department.  Shortly thereafter, he found himself the target of an APD manhunt, alleging murder and other crimes." *Doc. 9-2* at 6 (brief-in-chief on appeal).  His federal habeas claims reflect the same view.  For example, "Ground Two" for relief starts with the assertion that Petitioner was "deni[ed] due process of law due to actual innocence" because of a lack of "physical evidence."  *Doc. 1* at 6.

New Mexico does recognize a "freestanding" claim of "actual innocence" as the basis for state habeas relief.  The state decision in *Montoya* relied upon by Petitioner, for example, held that although "the freestanding claim of innocence asserted by Petitioner is 'not cognizable under the federal constitution,'" the "New Mexico Constitution permits habeas petitioners to assert freestanding claims of actual innocence."  *Montoya v. Ulibarri,* 142 N.M. 89, 95, 97, 163

---

[7]  *E.g., Haberer v. Napoli,*  2010 WL 2998665 at *8 (W.D.N.Y. 2010) (sufficiency of indictment and challenges to alleged defects in grand jury proceedings not cognizable "unless they present an independent federal constitutional claim."); *compare Toland v. Walsh,* 2008 WL 820184 at *11 (N.D.N.Y. 2008) ("Petitioner claims that his trial counsel should have moved to dismiss the indictment prior to trial. . . .  It is well settled that alleged errors in grand jury proceedings are not cognizable on federal habeas corpus review. . . .  Accordingly, any alleged errors that trial counsel made with respect to possible challenges to the indictment were rendered harmless as a matter of law by the trial jury's verdict [and the] claim of ineffective assistance of counsel with respect to testimony before the grand jury should be DENIED."), *with Wimbley v. Werholtz,* 187 Fed. App'x 840, 845 (10th Cir. 2006) (claim concerning grand jury not cognizable as independent claim under Grand Jury Clause of Fifth Amendment but arguments analyzed as part of ineffectiveness claim).

P.3d 476, 482, 484 (N.M. 2007).

The same is not true in federal habeas cases. To-date, neither the Supreme Court, the Tenth Circuit, or this district have held that a freestanding claim of "actual innocence" can be the basis for federal habeas relief. Two Supreme Court cases, for example, indicate that the claim might be raised in a capital case. However, while this matter was a potential capital case, it did not ripen into one.

Furthermore, the Supreme Court decisions do not definitively resolve the issue, and the circuits are split whether the Supreme Court decisions will permit a habeas court to entertain an actual innocence claim and, if so, under what circumstances.[8] Cases in the Tenth Circuit and in this district side with the view that such claims are not recognized.[9] While a claim of "actual

---

[8] In *Herrera v. Collins,* the Supreme Court stated that "freestanding" claims of "actual innocence" are not cognizable in federal habeas and merely assumed, for the sake of argument, that in a capital case, a "truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim. 506 U.S. 390, 417 (1993). More recently, the Court declined to "answer the question left open in *Herrera*" and decide whether "freestanding innocence claims are possible." *House v. Bell,* 547 U.S. 518, 554-55 (2006); *see also District Attorney's Office for Third Judicial Dist. v. Osborne,* ___ U.S. ___, ___, 129 S. Ct. 2308, 2321-22 (2009) ("As a fallback, Osborne also obliquely relies on an asserted federal constitutional right to be released upon proof of "actual innocence." Whether such a federal right exists is an open question. We have struggled with it over the years, in some cases assuming, *arguendo,* that it exists while also noting the difficult questions such a right would pose and the high standard any claimant would have to meet. . . . In this case too we can assume without deciding that such a claim exists, because even if so there is no due process problem.").

[9] *See LaFevers v. Gibson,* 238 F.3d 1263, 1265 n.4 (10th Cir. 2001) ("an assertion of actual innocence, although operating as a potential pathway for reaching otherwise defaulted constitutional claims, does not, standing alone, support the granting of the writ of habeas corpus."); *Sellers v. Ward,* 135 F.3d 1333, 1338-39 (10th Cir.) (noting that although the *Herrera* decision does not recognize "actual innocence" as an independent constitutional claim, it can serve as a "gateway" for procedurally-barred claims), *cert. denied,* 525 U.S. 1024 (1998); *Dombos v. Janecka,* CIV 09-200 JB/GBW (Doc. 104 at 30-31) (discussion of caselaw); id. (Doc. 127 at 8-9) (regarding the actual innocence section of the proposed findings: "The Court agrees with Judge Wormuth's analysis and conclusions on that matter, and will overrule F. Dombos' objection on that claim."); *Bartlett v. Janecka,* CIV 06-564 JH/KBM (Doc. 26 at 16-18) (same); *Trujillo v. Hatch,* CIV 08-0012 JH/WPL (Doc. 13 at 13-14) (same); *Fresquez v. Bravo,* CIV 00-1409 JP/LFG (Doc. 38 at 30-32) (same).

innocence" can be a way to avoid the effect of a procedural default in a federal habeas case, the state decisions here did not rely on any such default, Respondents do not assert any, and my review of the record does not suggest any.[10]

Accordingly, I will not entertain a "freestanding" claim of "actual innocence" but will consider Petitioner's protestation of innocence as an "insufficiency of the evidence" claim under *Jackson,* even though he has avoided uttering that phrase or citing to *Jackson* in his federal petition.  *See, e.g., Jackson v. Virginia,* 443 U.S. 307 (1979); *Hazel v. United States,* 303 F. Supp. 2d 753, 761 (E.D. Va. 2004) ("the *Herrera* opinion suggests, as Justice White makes explicit in his concurrence, that a petitioner asserting actual innocence on habeas review must meet the standard set forth by the Supreme Court in *Jackson*"); *Doc. 9-2* at 26-28 (on direct appeal, appointed counsel raised the arguments the Petitioner wanted raised as "additional questions presented;" first among them was an "actual innocence/*Jackson* sufficiency of the evidence" claim), *appeal dismissed,* 102 Fed. App'x 357 (4th Cir. 2004), *cert. denied,* 544 U.S. 935 (2005).

## D.  *"Inconsistent" Verdicts*

The eight-count indictment charged some counts "in the alternative."  The murder count, for example, contained several alternatives.  The first alternative murder count contained the different degrees of murder as possible bases to convict – first degree "willful and deliberate"

---

[10]  *See Doc. 9* at 8-11 (Respondent's answer asserting all claims were exhausted and should be denied on the merits); *Lucero v. Lemaster,* 131 Fed. App'x 636, 639 (10th Cir. 2005) ("In the absence of a plain statement applying a state procedural bar, we will not deem the claim defaulted.") (citing *Klein v. Neal,* 45 F.3d 1395, 1398-99 (10th Cir. 1995)); *see also, e.g., Herrera,* 506 U.S. at 404 ("our habeas jurisprudence makes clear that a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.").

murder, or the lesser offenses of second degree murder with a firearm or manslaughter with a firearm.  The second alternative murder count was "felony murder," with kidnapping being one of the later charged felonies.  *See Record* at 95-96 (Count I).[11]

The basis for two of Petitioner's claims is that the jury rendered a "conflicting" verdict on the murder count because they found him guilty of first-degree murder and guilty of felony murder.  *See id.* at 262, 268; *see also Trial Transcript Vol. VIII* at 12.  He argues that he:

> was subjected to ***conflicting*** verdicts.  The Petitioner was found guilty of willful and deliberate murder and felony murder.  Both crimes have different elements.  One requires a finding of fact by the jury of the Defendant's state of mind.  Felony murder does not have this requirement.  Felony murder requires a different finding of fact by the jury, whether a felony was committed as a pert of the murder.  There was ***no unanimous finding*** of fact by the jury for either crime.

*Doc. 1* at 15 (claim that lack of unanimity in jury verdict violates due process).  Petitioner also contends that counsel was ineffective for failing to challenge the verdicts at trial or on appeal.  *See id.* at 21.

Inconsistency in a verdict is not grounds for federal habeas relief.  Assuming for the sake of argument that there is anything inconsistent with the two verdicts, it is long- and well-settled that there is no constitutional right to a "consistent" verdict.[12]  Nor is an inconsistent verdict a

---

[11]  The kidnapping counts were grounded in that Petitioner either did not free the victims "in a safe place" or inflicted "great bodily . . . harm" upon them.  *See Record* at 96 (Counts 2-3).  The aggravated burglary count alternatives were that Petitioner either entered the dwelling with the intent to commit a felony/theft while armed with a "deadly weapon" (firearm) or, in the course of the same, he committed a battery.  *See id.* at 96-97 (Count 4).  Initially, the aggravated battery count alternatives were that Petitioner either used a handgun or inflicted great bodily harm, *id.* at 97 (Count 6), but during trial the prosecution dismissed the "great bodily harm" alternative for aggravated battery, leaving only the firearm as the basis for the aggravation, *see Trial Transcript Vol. VII* at 12.

[12]  *E.g., Yeager v. United States,* ___ U.S. ___, ___,  129 S. Ct. 2360, 2369-70 (2009); *United States v. Powell,* 469 U.S. 57, 62(1984); *Harris v. Rivera,* 454 U.S. 339, 345 (1981); *Dunn v. United States,* 284 U.S. 390, 393-394 (1932); *United States Velarde,* 186 Fed. App'x 817, 824 (10th Cir. 2006), *cert. denied,* 549 U.S. 1358 (2007).

violation of New Mexico state law.[13]  Even if it were, this Court could not set aside the verdict

on that basis.[14]

Thus, to the extent that "Ground Six" is predicated on a "conflicting verdict" theory, I

recommend that it be dismissed.  It may be that, without directly saying so, Petitioner's

"inconsistency/unanimity" claim is again expressing his view that the evidence was insufficient

to support either of the alternative verdicts on the murder count.

> [A] criminal defendant already is afforded protection against jury irrationality or
> error by the independent review of the sufficiency of the evidence undertaken by the
> trial and appellate courts.  This review should not be confused with the problems
> caused by inconsistent verdicts. . . .  We do not believe that further safeguards
> against jury irrationality are necessary.

*Powell,* 469 U.S. at 67.  If that is the case, I address the claim in the sufficiency analysis below

and will also address the associated ineffectiveness claim later in these proposed findings.

## III.  Overview Of AEDPA Standards Of Review

Three AEDPA provisions primarily govern the standard for federal habeas review.  For

---

[13] *E.g., State v. Castaneda,* 130 N.M. 679, 682, 30 P.3d 368, 371 (N.M. App.) ("Defendant argues that failure to restrain the children cannot be the basis for the child abuse charge because the jury acquitted her on the charges of child restraint violations.  We disagree.  We can only speculate as to the reasons for the jury's decision to acquit, and inconsistent verdicts are not necessarily irrational or erroneous."), *cert denied,* 130 N.M. 484, 558, 28 P.3d 476, 1099 (N.M. 2001); *State v. Padilla,* 86 N.M. 282, 284, 523 P.2d 17, 19 (N.M. App.) ("Defendant asserts the conviction of rape and the acquittal of sodomy is an irrational result amounting to fundamental error.  Assuming the verdicts are inconsistent, we can only speculate as to why the jury reached that result. . . .  We cannot, on the basis of speculation only, hold the verdicts are irrational.  That the verdicts may not be in harmony does not mean they are irrational, that is, without reason.  Accordingly, the fundamental error claim provides no basis for reversal."), *cert. denied,* 86 N.M. 281, 523 P.2d 16 (N.M. 1974) .

[14] *See e.g., Estelle,* 502 U.S. at 67 (violations of state law are not grounds for habeas relief); *Brunson v. Tracy,* 378 F. Supp. 2d 100, 110 (E.D.N.Y. 2005) ("It is well-settled that federal habeas relief is unavailable for inconsistent verdicts. . . .  Because this Court is without power to set aside a state court conviction on the basis of repugnancy, . . . it follows logically that this Court is similarly powerless to set aside a state court's erroneous determination that the jury's verdict was in fact repugnant.").

Petitioner's cognizable claims, when a state court denies a claim on the merits, a federal court cannot grant habeas relief unless the state decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). Factual determinations made by a state court are presumed to be correct unless the Petitioner can rebut them by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

"Clearly established" Supreme Court precedent is dispositive of the § 2254(d)(1) analysis – "only if we determine that the law is clearly established do we inquire whether the state court decision is either contrary to or an unreasonable application of that law." *Fairchild v. Workman,* 579 F.3d 1134, 1139 (10th Cir. 2009). As for whether the law is "clearly established," federal habeas "courts may no longer extract clearly established law from the general legal principles developed in factually distinct contexts." *Lambert v. Workman,* 594 F.3d 1260, 1263 (10th Cir. 2010).

> [If a petitioner] has not cited, nor have we found, any Supreme Court authority clearly establishing the . . . principles at issue here[,] [u]nder the AEDPA standards set out above, that is fatal to his claim. Unless and until the Supreme Court decides [the issue] habeas relief on this basis is unavailable, and it is not the province of this court to resolve the issue . . .

*Id.*; *see also Renico v. Lett*, ___ U.S. ___, ___, 130 S. Ct. 1855, 1866 (2010) ("The [Sixth Circuit's] *Fulton* decision, however, does not constitute clearly established Federal law, as determined by the Supreme Court, . . . so any failure to apply that decision cannot independently authorize habeas relief under AEDPA.") (internal quotations, citations, and parentheticals omitted for clarity).

When a state court does not resolve the claim "on the merits and [it] is not otherwise

procedurally barred, [the federal habeas court's] standard of review is more searching. . .

because § 2254(d)'s deferential standards of review do not apply in such circumstances."

*Alverson v. Workman,* 595 F.3d 1142, 1146 (10th Cir.), *cert. denied,* 131 S. Ct. 512 (2010).  This

Court will review such claims *de novo,*[15] under the traditional habeas comity considerations that

predate AEDPA and require due deference to state court decisions and criminal convictions.[16]

---

[15]  This sort of review is commonly referred to as "*de novo,*" but does not mean this Court ignores the federal habeas rules that require review based on the state court record and limit the circumstances under which a federal evidentiary hearing is required.  *See, e.g., Cone v. Bell,* ___ U.S. ___, ___, 129 S. Ct. 1769 (2009) ("Because the Tennessee courts did not reach the merits . . . federal habeas review is not subject to the deferential standard that applies under AEDPA . . . Instead, the claim is reviewed *de novo.*") (citing *Rompilla v. Beard,* 545 U.S. 374, 390 (2005) and *Wiggins v. Smith,* 539 U.S. 510, 534 (2003)); *Lockyer v. Andrade,* 538 U.S. 63, 71 (2003) (rejecting Ninth Circuit approach that "requires federal habeas courts to review the state court decision *de novo* before applying the AEDPA standard of review"); Rules 5-8, RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES DISTRICT COURTS (habeas rules for review after answer); *c.f. Herrera v. Lemaster,* 225 F.3d 1176, 1179 (10th Cir. 2000) ("Under pre-AEDPA law, a federal habeas court was required to examine the entire state court record before making a harmless error determination."), *on r'hrg en banc,* 301 F.3d 1192 (10th Cir. 2002), *cert. denied,* 537 U.S. 1197 (2003); *compare Snow v. Sirmons,* 474 F.3d 693, 696-97 (10th Cir. 2007) (if state court does not review merits of the claim, federal appellate review is "independent" if the district court's factual findings are based state court record and "*de novo*" of the district court's factual findings are "in the first instance").

[16]  *See e.g., Harrington,* 131 S. Ct. at 786 ("Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal.") (quoting Justice Stevens' concurrence in *Jackson,* 443 U.S. at 332, n.5)); *Jefferson v. Upton,* ___ U.S. ___, ___, 130 S. Ct. 2217, 2220-22 (2010) (discussion of statutory and *Townsend* directives concerning deference to state court factual conclusions); *Danforth v. Minnesota,* 552 U.S. 264, 274-82 (2008) (discussion of development of *Teague* nonretroactivity principle that will preclude habeas relief); *Fry v. Pliler,* 551 U.S. 112, 116-17 (2007) (discussion why *Brecht* rejected the *Chapman* "harmless" standard for federal habeas review of state decisions; "we rejected the *Chapman* standard in favor of the more forgiving standard of review applied to nonconstitutional errors on direct appeal from federal convictions [because] application of *Chapman* would undermine the States' interest in finality . . . would "infringe upon the States' sovereignty over criminal matters . . . would undercut the historic limitation of habeas relief to those grievously wronged . . . and would impose significant social costs") (internal quotations, citations, and bracketed editing omitted); *Williams v. Taylor,* 529 U.S. 362, 375 (2000) ("It is, of course, well settled that the fact that constitutional error occurred in the proceedings that led to a state-court conviction may not alone be sufficient reason for concluding that a prisoner is entitled to the remedy of habeas."); *id.* at 383 ("The *Teague* cases reflect this Court's view  that habeas corpus is not to be used as a second criminal trial, and federal courts are not to run roughshod over the considered findings and judgments of the state courts that conducted the original trial and heard the initial appeals.  On the contrary, we have long insisted that federal habeas courts attend closely to those considered decisions, and give them full effect when their findings and judgments are consistent with

Here, the state court "adjudicated" all of Petitioner claims "on the merits." As noted in the "actual innocence" section, none of the claims were rejected by the state courts for a specified procedural reason. As is not uncommon, one of the state decisions was not accompanied by any reasons whatsoever – the bulk of the federal claims were raised in the state post-conviction proceedings where the trial judge rejected relief in a form stating relief was "denied." *See Doc. 9-4* at 19. Regardless, the AEDPA standards still apply to this one-word decision.

The Supreme Court made clear this year that the AEDPA "statute refers only to a 'decision,' which resulted from an 'adjudication.'" *Harrington v. Richter,* ___ U.S. ___, ___, 131 S. Ct. 770, 784 (2011). "There is no text in the statute requiring a statement of reasons." *Id.* The state court also need not expressly say the denial was on the merits. *Id.* The presumption is that the denial was on the merits, unless there is a concrete "reason to think some other explanation for the state court's decision is more likely." *Id.* at 785. Speculation will not suffice. *Id.* Again, Respondents' answer does not assert any procedural default and the record does not suggest one. *See Doc. 9* at 8-11. Thus, there is no reason to conclude that the one-word rejection of Petitioner's claims was not "on the merits."

federal law."); *Coleman v. Thompson,* 501 U.S. 722, 747-48 (1991) ("Recognizing that the writ of habeas corpus is a bulwark against convictions that violate fundamental fairness, we also acknowledged that 'the Great Writ entails significant costs. . . . The most significant of these is the cost to finality in criminal litigation that federal collateral review of state convictions entails") (internal quotations and citations omitted); *Miller v. Fenton,* 474 U.S. 104, 112 (1985) (in course of deciding that issue of voluntariness of a confession is a legal question federal habeas courts decide "independently," noting that "the federal habeas court, should, of course, give great weight to the considered conclusions of a coequal state judiciary.") (citing *Culombe v. Connecticut,* 367 U.S. 568, 605 (1961) (opinion of Justice Frankfurter)); *Jackson,* 443 U.S. at 323 ("A judgment by a state appellate court rejecting a challenge to evidentiary sufficiency is of course entitled to deference by the federal courts, as is any judgment affirming a criminal conviction. . . . The federal habeas corpus statute presumes the norm of a fair trial in the state court and adequate state postconviction remedies to redress possible error. . . . What it does not presume is that these state proceedings will always be without error in the constitutional sense.").

# IV.  Analysis On Merits

The theme of innocence underlies practically all of Petitioner's claims.  He contends that the evidence against him was largely circumstantial, and argues that what little DNA and blood evidence the prosecution introduced was "contaminated" and "fabricated," while other potentially "exculpatory" evidence went unexplored.  Instance after instance of asserted ineffective assistance of counsel is based on alleged failures to deal with Petitioner's perceived problems with the physical evidence, and to otherwise bolster the defense with physical evidence that could link someone else to the murder scene.  Thus, while Petitioner has avoided using the phrase "insufficiency of the evidence" or citing *Jackson* in his federal petition, it is the topic I discuss first.

## A.  Sufficiency Of Evidence

The Supreme Court's decision in *Jackson* sets forth the clearly established law for evaluating sufficiency of the evidence claims.  *See, e.g., Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *Alverson,* 595 F.3d at 1157.  Under *Jackson,* "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  443 U.S. at 319 (emphasis original).  This review is based on "all of the evidence . . .  in the light most favorable to the prosecution.  *Id.* (same).  The review is also very limited.  This Court cannot reweigh conflicting evidence or assess the credibility of witness.  *E.g., Valdez v. Bravo,* 373 F.3d 1093, 1097 (10th Cir.), *cert. denied,* 543 U.S. 1008 (2004).

As in the state courts, Petitioner's federal sufficiency claim is not directed at any particular count of conviction.  The claim of innocence was raised both on direct appeal and in

the *pro se* post-conviction proceedings, and focus on different aspects.  On direct appeal,

appointed counsel noted that Petitioner "has a right to have all of his issues presented to this

Court," and so counsel's brief-in-chief contained "[a]dditional questions . . . Mr Gallegos has

directed undersigned counsel to raise."  *Doc. 9-2* at 26.  Counsel characterized the sufficiency

issue as follows:

> [Petitioner] wishes the Court to consider a *Montoya* [state law] claim of actual
> innocence, to incorporate a *Jackson v. Virginia* . . . claim [and] consider a challenge
> to the sufficiency of the evidence to sustain his convictions. . . .  In this case, no one
> identified [Petitioner] as the man inside the house.  [He] urges that [the] officers'
> identification of him as the man with the truck in the dark of night were suspect due
> to his lawsuit, as were the documents bearing his name that were recovered at the
> scene.  [The victim's] blood was not found in the truck or along the route between
> the truck and the [victim's] home.  The DNA analyst testified that the hair in the
> mask did not mean that [Petitioner] had worn it.  DNA evidence is always subject to
> cross-contamination and possible tampering.   The DNA analyst admitted to
> manipulating the samples in order to get her readings.  Accordingly, [Petitioner]
> proposes that no rational jury could find each of the elements of each of the crimes
> charged beyond a reasonable doubt, and that his convictions should therefore be
> overturned.

*Id.* at 26-28.

In the state post-conviction proceedings Petitioner argued that he was "denied due

process of law [and] is actually innocent [under] *Montoya* [and] *Jackson v. Virginia*" because:

> The victim was violently bludgeoned to death.  There was blood splattered all over
> the garage.  According to the prosecution, the Petitioner was stopped within minutes
> at a traffic stop and observed by four police officers.  There was no blood covering
> the Petitioner.  There was no blood covering the Petitioner.  There was no blood in
> the Petitioner's truck, the "escape" vehicle.  There was no bloody shoe prints in the
> Petitioner's truck, no blood trails on the "escape" route or walls climbed.  The
> bloody shoe prints in the garage do not match the Petitioner's feet.  The defensive
> bite wounds sustained by the victim do not match the Petitioner's teeth, nor was the
> Petitioner's DNA saliva in the wounds.  The State's forensic DNA examiner
> admitted to altering the DNA samples to match the Petitioner's (fabrication of
> evidence).  The State made no claim nor did it find a change of clothing linked to the
> Petitioner.  [In the surviving victim's] first statement, she told  the police officer the
> murderer had on blue pants, then changed her statement to fit the petitioner.  Could
> four trained police officers miss a person covered in the victim's blood?  The actual

murderer transferred the victim's blood to everything she or he touched after the crime.

*Doc. 9-4* at 2-3 (punctuation supplied for clarity).  "Ground Two" of the federal petition is virtually identical to the state post-conviction claim, except it omits any reference to the *Montoya* or *Jackson* cases, and it excludes any argument concerning the victim's statement and description of the pants.  *See Doc. 1* at 6-7.

It is not settled for AEDPA purposes how sufficiency of the evidence claims are to be viewed.  Generally, such claims are characterized as "mixed" questions of law and fact, and the federal habeas court applies both § 2254(d)(1) and (d)(2) in considering such claims.  *Compare Diestel v. Hines,* 506 F.3d 1249, 1267 (10th Cir. 2007) (issue presents "mixed" question and both apply), cert. denied, 553 U.S. 1079 (2008),  *and Morris v. Workman,* 382 Fed. App'x 693, 696 (10th Cir. 2010) (same), *with Dockins v. Hines,* 374 F.3d 935, 939 (10th Cir. 2004) (noting issue unsettled) *and Littlesun v. Parker,* 380 Fed. App'x 758, 760 (10th Cir. 2010) (same).  I will assume it is a mixed question, and I will apply the relevant AEDPA standards to both state decisions since Petitioner raised the sufficiency arguments slightly differently in the two proceedings.

Neither decision is "contrary to" clearly established Supreme Court precedent within the meaning of § 2254(d)(1).  First, the New Mexico Supreme Court specifically quoted, cited and applied the applicable *Jackson* standards.  *See Gallegos,* 146 N.M. at 96, 206 P.3d at 1001.  Second, the summary denial is not "contrary to" if its "result" is consistent with *Jackson.  See, e.g.,  Stevens v. Ortiz,* 465 F.3d 1229, 1235 (10th Cir. 2006) (citing, among other cases, *Early v. Packer,* 537 U.S. 3, 8 (2002)), *cert. denied,* 549 U.S. 1281 (2007); *see also Harrington,* 131 S. Ct. at 784 ("Where a state court's decision is unaccompanied by an explanation, the habeas

petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."). The summary denial is consistent with *Jackson* for the reasons that follow.

"'Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Yarborough v. Alvarado,* 541 U.S. 652, 663 (2004) (quoting *Williams,* 529 U.S. at 413). So long as "'fairminded jurists could disagree on the correctness of the state court's decision," federal habeas relief is "precluded." *Harrington,* 131 S. Ct. at 785 (quoting *Yarborough,* 541 at 664).

Neither state decision is an unreasonable application of the *Jackson* standard under § 2254(d)(1) because the conclusions that the evidence was sufficient to convict are not remotely subject to disagreement. Also, having reviewed the voluminous trial record and transcripts, there is no basis to conclude that the state findings rely on any "unreasonable determination of the facts in light of the evidence presented" during trial under § 2254(d)(2).

The basic argument for Petitioner's claim of "innocence" is that no one identified him as the person who committed the crime and the few bits of circumstantial physical evidence tying him to the crime are not enough. The New Mexico Supreme Court declined to reweigh the evidence,[17] and squarely addressed and rejected this basic contention:

> At trial, four police officers positively identified Defendant as the man they observed on the night of the murder. Additional circumstantial evidence linked Defendant's presence in the area to the murder. The officers saw Defendant jump over the wall

---

[17] It found that because the defense was asking it to "perform a blanket review of each element of every offense for which he was convicted, without pointing to evidence on the record, Defendant is essentially asking this Court to re-weigh the evidence against him." Consistent with *Jackson,* it found that neither a blanket review or reweighing the evidence was "appropriate for an appellate court on direct appeal." *Gallegos,* 146 N.M. at 96 , 206 P.3d at 1001. Nevertheless, as discussed above, it alternatively reviewed the evidence and found that "there is substantial evidence in support of the jury's verdict." *Id.* at 97, 206 P.3d at 1001.

enclosing the Hogan's gated neighborhood and later found two duffel bags near the location where Defendant was first spotted; the bags contained personal items belonging to the Hogans and items used in the attack. The officers also observed that Defendant had a fresh cut on his cheek. After initially cooperating with the police officers, Defendant evaded arrest and fled to Mexico. The prosecution also established motive, based on Jim Hogan's false accusation regarding the missing watch. We conclude that the evidence of record is sufficient to support Defendant's convictions.

　　　　　As additional support for his insufficient evidence claim, Defendant raises allegations of possible bias and tampering with the evidence against him. However, we recall that ''[c]ontrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject Defendant's version of the facts.''

*Gallegos,* 146 N.M. at 96-97, 206 P.3d at 1001-02 (quoting *State v. Rojo,* 126 N.M. 438, 444,

971 P.2d 829, 835 (N.M. 1998)).

　　　　Even if I were reviewing this claim *de novo,* the result is the same. Under *Jackson,* when

"faced with a record of historical facts that supports conflicting inferences," a federal habeas

court "must presume – even if it does not affirmatively appear in the record – that the trier of fact

resolved any such conflicts in favor of the prosecution, and must defer to that resolution."

*Jackson,* 443 U.S. at 326; *see also McDaniel v. Brown,* ___ U.S. ___, 130 S. Ct. 665, 673

(2010). A habeas court "'must consider all of the evidence admitted by the trial court,'

regardless whether that evidence was admitted erroneously." *McDaniel,* 130 S. Ct. at 673

(quoting *Lockhart v. Nelson,* 488 U.S. 33, 41 (1988)).

　　　　Contrary to Petitioner's reliance on instances of physical evidence that did not tie him to

the murder, *Jackson* does not require any particular type of proof at trial to convict. Testimonial

evidence, circumstantial evidence, or direct evidence, and the inferences to be drawn from such

evidence, alone or in combination, will suffice.[18] Here, the officers' testimony about the events

---

[18]　　　A reviewing court, whether on direct appeal or habeas review, "do[es] not make credibility determinations in evaluating the sufficiency of the evidence." . . . This conclusion is not altered by petitioner's argument that

they witnessed and the evidence they found that night, coupled with the DNA directly linking

Petitioner to the murder scene, and other circumstantial evidence such as Petitioner's physical

description and prowess, was sufficient to support the verdicts under the *Jackson* standard. *See,*

*e.g., Trial Transcript Vol. II* at 52-54, 58-59, 63-64, 140-47,151-53, 179-88; *Trial Transcript*

*Vol. III* at 11-22, 52-57, 59; *Trial Transcript Vol. IV* at 27-39, 48-49, 93, 98, 120-28; *Trial*

*Transcript Vol. V* at 88-89, *Trial Transcript Vol. VI* at 36-85; *see also McDaniel,* 130 S. Ct. 665,

672 -73 ("The Report did not contest that the DNA evidence matched [the defendant]. That

DNA evidence remains powerful inculpatory evidence even though the State concedes [the

State's expert] overstated its probative value").

## B.  Firearm Enhancement & Apprendi

Petitioner received an enhanced sentence because of possession of a firearm. In Ground

Eight, he asserts an *Apprendi* claim that is predicated on a sufficiency of the evidence theory.

That is, Petitioner contends there was "no jury finding concerning [his] possession of a firearm"

---

the evidence was insufficient because there was no forensic evidence tying
him to the crime. "Lack of physical evidence does not render the evidence
that is presented insufficient." *United States v. Magallanez,* 408 F.3d 672,
681 (10th Cir. 2005); *see also, O'Hara v. Brigano,* 499 F.3d 492, 500 (6th
Cir. 2007) (victim's testimony alone sufficient even though not
corroborated by other witnesses or physical evidence); *United States v.
Bieghler,* 198 Fed. Appx. 566, 568 (8th Cir. 2006) ("'[F]orensic evidence'
is not required for conviction.").

*Hale v. Davis,* 2009 WL 4666489 at *17 (E.D. Mich. 2009); *see also, e.g., Desert Palace, Inc. v. Costa,*
539 U.S. 90, 100 (2003) ("[W]e have never questioned the sufficiency of circumstantial evidence in
support of a criminal conviction, even though proof beyond a reasonable doubt is required."); *Whittington
v. Nordam Group Inc.,* 429 F.3d 986, 996 (10th Cir. 2005) ("The authorities are legion that circumstantial
evidence can be every bit as compelling as direct evidence."); *Rodriguez v. Roberts,* 371 Fed. App'x 971,
975 (10th Cir.) ("Circumstantial evidence alone may support a criminal conviction."), *cert. denied,* 131 S.
Ct. 481 (2010); *United States v. Willis,* 232 Fed. App'x 527, 536 (6th Cir.) ("'[P]hysical evidence is not
required to sustain a conviction.'") (quoting *United States v. Davis,* 306 F.3d 398, 409 (6th Cir. 2002),
*cert. denied,* 537 U.S. 1208 (2003)), *cert. denied,* 552 U.S. 1084 (2007).

and there "were no working guns at the [victims'] household nor did anyone claim the murderer brought a gun." *Doc. 1* at 16.  He brings an ineffectiveness claim based on the same argument. *Id.* at 22.  These assertions are utterly frivolous.

The surviving victim testified that "in addition to the ski mask," what she "noticed first was the fact that he had a gun, a handgun pointed at me. . . . in his left hand . . . pointing the gun at me . . . the club was pointed down, but the gun was point[ed] at me." *Trial Transcript Vol. II* at 3.  She subsequently identified the State's Exhibit 7 "revolver" as "[t]he gun he was holding that night." *Id.* at 45.  Exhibit 7 was the revolver recovered from one of the bags found by the wall. *Trial Transcript Vol. IV* at 41-42.  In addition, the jurors were instructed on the elements of the charges of aggravated burglary with a deadly weapon, armed robbery and aggravated battery.  Each of those instructions specifically contained as a necessary element that "[t]he defendant was armed with a handgun" and the jurors found Petitioner guilty of those charges. *Record Proper* at 245, 248, 249 (instructions for Counts 4 through 6); *id.* at 274, 278, 280 (guilty verdicts Counts 4 through 6).  Moreover, the jurors also answered in the affirmative on ***five*** separate "special verdict" forms that they "unanimously [found] beyond a reasonable doubt that a firearm was used in the commission of" kidnapping as charged in Counts 2 and 3, aggravated burglary in Count 4, armed robbery in Count 5 and aggravated battery in Count 6. *See id.* at 284-88.

Thus, for the reasons stated above, I find that the state court's rejection of Ground Eight in the post-conviction proceeding is neither "contrary to" or "unreasonable" as a matter of law or fact. *See Doc. 9-2* at 28 & n.5; *Doc. 9-4* at 8, 13-14.  I address the ineffectiveness aspect separately.

## C.  Prosecutorial Misconduct & Exculpatory Evidence

### 1.  The Trial Strategy & Habeas Claims

Petitioner's prosecutorial and exculpatory evidence claims raised in Grounds Three, Four and Five are best understood in light of the defense theory pursued at trial because the claims echo that defense strategy.  Counsel argued that the DNA evidence was key to the prosecution's case, but that when subjected to scrutiny, this evidence and the prosecutor's interpretation of it did not establish Petitioner's guilt beyond a reasonable doubt.  *See Trial Transcript Vol. II* at 33-34.  To this end, defense counsel highlighted and challenged the procedures used to perform DNA testing.  *See Trial Transcript Vol. VI* at 105-20.  Another obvious point that from the testimony counsel elicited was that for at least six weeks before the murder, there were numerous other workers in the house who surely noticed the safe in the garage.  *See, e.g., Trial Transcript III* at 137-38, 155-56, 161-62; *see also Trial Transcript II* at 34 (defense opening – "You will hear testimony that there were several people in an out of that house during that period of time . . . they were undergoing an extensive remodel with lots of different kinds of workers, and they were in an out of the house for a long period of time.").

Some of the other specific points defense counsel emphasized in closing were:  the defense does not have the burden to ask that every piece of evidence be tested; for the duration of the crime, Petitioner's truck would have had to be parked for almost an hour on a highly traveled and patrolled street with no area designated for parking, yet no officer noticed it; failure to have the surviving victim try to identify Petitioner by his voice; defendant had no blood on him nor was his truck bloody; instances of imprecise collection and documentation of evidence that could have led to cross-contamination and transfer of the DNA evidence; physical evidence

pointed to the intruder exiting through the front door instead of the back headed to the wall where Petitioner was found; and Petitioner had reason to flee the officers because of a bad experience with them just weeks before.  *See, e.g., Trial Transcript Vol. VII* at 44-76.

Of the three claims discussed here, two assert that the prosecution "destroyed" and "withheld" evidence that was "exculpatory," and the other maintains that the prosecution "fabricated" the sample of Petitioner's DNA.  One of them was raised on direct appeal as an ineffectiveness claim, which the New Mexico Supreme Court denied without prejudice so that Petitioner could raise it in post-conviction proceedings.  All three claims were raised in the post-conviction proceedings.  *Compare Doc. 1* at 8-9 ("Ground Three"), *with Doc. 9-2* at 28 & n. 5 (ineffectiveness issues raised on direct appeal and footnote that includes some of the specific allegations), *and Gallegos,* 146 N.M. at 97, 207 P.3d at 1002 ("Although Defendant has failed to establish a claim of ineffective assistance of counsel, we reach this conclusion without prejudice"); *see also Doc. 9-4* at 3-7 (substance of Grounds Three, Four, and Five raised in post-conviction proceedings).

Ground Five raises asserts a denial of due process for "destruction of exculpatory evidence," on the ground that the "police wiped, removed or destroyed all finger prints in the Hogan house and the Petitioner's pick up truck . . . when they learned that fingerprints in the Hogan house identified another person who may have been the murderer."  *Doc. 1* at 13.

Ground Three asserts a denial of due process for "withholding exculpatory evidence," namely:

> There was perjury by the prosecutor.  There were two different discovery packets.  After the first, the prosecutor made a false 5-501 declaration.  The prosecutor even caused the jail guards to steal issued discovery material.  This material was never again provided to defense counsel.  This included photographs of x-rays of the victim's injuries and photos of a bloody hammer.  This hammer

disappeared.  It may have been the murder weapon and may have had the murderer's finger prints and DNA on it.  This hammer was not on any evidence inventory or discovery list.  The State admitted at trial that the prosecutor withheld a CD computer disk with over 1500 photographs.

This CD can prove the State's tampering with evidence and contaminating the evidence.  This CD shows the police getting gloves and a ski mask out of the Petitioner's truck then placing them along the escape route with the duffle bag in the neighbor's back yard.  This CD also shows the police then taking the items from the Petitioner's truck and placing them with blood evidence from the garage murder scene.  This cross-contaminated the Petitioner's items with the murder scene DNA samples or evidence.  The State withheld the fact that a female witness saw Gallegos driving his truck during the time of the murder.  This alibi witness was concealed during the trial.  This woman made numerous attempts to speak to the prosecutor and did prior to trial.  She also attempted to contact defense counsel.  She did visit the Petitioner in jail after trial.  Immediately after the visit jail guards confiscated the legal papers with this alibi witness personal identification and location information.

*Id.* at 8-9.

Ground Four asserts a violation of due process because of "fabricated" evidence,

consisting of the following:

The State did not obtain a current or fresh DNA sample from the Petitioner. The State did present a twenty year old DNA sample from the Petitioner.  There was no chain of custody of this evidence.  The State DNA forensic expert did admit that she had to alter the Petitioner's DNA sample to match evidence at the crime scene. The State presented a false murder weapon.  A round piece of wood was claimed to be the murder weapon.  It had no blood on it.  The State claimed it was wrapped in plastic.

This plastic covering was never in any evidence discovery disclosure nor was the plastic covering presented at trial.  The missing x-ray photos show square edged weapon injuries to the victim.  There was no trace or scrapings of the plastic covering in any of the wounds sustained by the victim.

The police and crime scene investigators took gloves and a ski mask from the Petitioner's truck then fabricated evidence by placing these items along the "escape" route.  These items were  then placed on a blue tarp with bloody evidence from the garage murder scene to cross-contaminate the gloves and ski mask with DNA from the murder.

*Id.* at 11-12.

## 2.  Applicable Law

In general, prosecutorial misconduct will not support habeas relief unless it amounts to a

violation of due process.  *See e.g., Hamilton v. Mullin,* 436 F.3d 1181, 1187 (10th Cir.), *cert. denied,* 549 U.S. 1023 (2006).  This is so because "not every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a failure to observe that fundamental fairness essential to the very concept of justice."  *Id.*  (internal quotations and citations omitted).  Petitioner's characterization of some of the evidence as "exculpatory" and "fabricated" invokes the *Brady* line of cases.  I also believe that by the above factual assertions, Petitioner is attempting to raise the issue of "bad faith" under the Supreme Court's *Youngblood* decision.  *See Doc. 9-4* at 3-7 (state habeas petition specifically citing *Brady* and *Napue* and "due process" for all of these claims).

I have not found any binding authority that clearly discusses whether *Brady/Youngblood* claims present questions of law, questions of fact, or mixed questions of law and fact for AEDPA purposes.  I will assume the mixed question scenario, based on statements made in decisions in this Circuit about what will turn out to be the dispositive elements here.  *See Douglas v. Workman,* 560 F.3d 1156, 1172 (10th Cir. 2009) ("question of whether . . . evidence is material is a mixed question of law and fact"); *Crosby v. Watkins,* 599 F. Supp. 2d 1257, 1281 (D. Colo. 2009) ("'The issue of bad faith under *Youngblood* is a mixed question of law and fact'") (quoting *Riggs v. Williams,* 87 Fed. App'x 103, 106 (10th Cir.), *cert. denied,* 541 U.S. 1090 (2004)).

### 3.  The Record Does Not Support Petitioner's Assertions

As an initial matter, all of Petitioner's hyperbolic assertions of fabrication, tampering, concealment, are simply speculation, which fails to satisfy his burden under AEDPA.  This alone

is reason for denying for habeas relief.[19]

Moreover, the record belies most of them.  For example, the defense "stipulate[d] to the validity of the known sample of Mr. Gallegos."  *Trial Transcript Vol. II* at 3.  The strategic reason for the stipulation is obvious – the sample was taken in connection with the investigation of a prior string of robberies, one of which ended in murder.  Petitioner was a suspect in those robberies and that prior murder, but was never charged.  That is why his DNA was readily accessible for the police to test without taking another samples.  That fact would have been revealed if defense counsel insisted on chain-of-custody testimony from the witness the State had ready to testify.  Indeed, the State filed a motion in limine asking the trial judge to allow the chain-of-custody testimony and defense counsel countered with a motion in limine to exclude any reference to the prior murder.  At the hearing on the motions, defense counsel noted that if the trial judge was going to allow the chain-of-custody witness to testify (which he did), the defense would be entering a stipulation so the jurors would not hear of the prior similar criminal conduct.  *See Trial Transcript Vol. I* at 14-22 (motion in limine hearing); *Record Proper* at 196

---

[19]   *See, e.g., Wood v. Bartholomew,* 516 U.S. 1, 8 (1995) ("Whenever a federal court grants habeas relief to a state prisoner the issuance of the writ exacts great costs to the State's legitimate interest in finality. . . .  Those costs may be justified where serious doubts about the reliability of a trial infested with constitutional error exist.  But where, as in this case, a federal appellate court, second-guessing a convict's own trial counsel, **grants habeas relief on the basis of little more than speculation with slight support,** the proper delicate balance between the federal courts and the States is upset to a degree that requires correction.") (per curiam) (emphasis added); *Rodriguez,* 371 Fed. App'x at  976 ("Some of Rodriguez's allegations, such as one concerning peremptory strikes, are restatements of his other habeas claims.  Others, such as Rodriguez's allegation that the prosecutor fabricated evidence, are speculation."); *Molina v. Spanos,* 1999 WL 626126 at *10 (10th Cir. 1999) ("These speculative and conclusory claims are insufficient to establish a constitutional violation."), *cert. denied,* 528 U.S. 1192 (2000); *Gomez v. Lempke,* 2011 WL 197425 (W.D.N.Y. 2011) (citing *Wood* for proposition emphasized above and other New York district court cases for the propositions that "conclusory statements based on speculation 'are inadequate to satisfy petitioner's burden'" and "vague, unsupported allegations of constitutional violations and errors during petitioner's state trial did not assert a viable habeas claim").

(defense motion in limine); *id.* at 200-01 (State motion in limine).[20]

Also, Petitioner's assertion that his DNA sample was "altered" misconstrues the testimony.  The DNA analyst used a procedure that consisted of different test "runs" when a particular test did not reveal useable "markers."  Counsel went into painstaking detail on cross-examination about this practice, the jargon-laced scientific basis of which I will not repeat in detail here.  The clear point was that, when the markers are not revealed as they should be by the test run, the ***test*** sample is "manipulated" and subjected to another run.  For example, the analyst may reinject DNA into the test if the run showed there are low levels of DNA present, or the analyst may dilute the DNA in the test if run showed the markers were off the "scale."  *See Trial Transcript Vol. VI* at  105-20.[21]  Through this line of questioning counsel highlighted for the jurors that, it takes very few cells to produce DNA, and, for the fingernail scrapings where there was a mixture of the victim's and Petitioner's blood, this "combining" procedure could have overlapped the results and shown a marker attributed to Petitioner that was exactly the same as

---

[20]  During trial, counsel told the trial judge that the defense would stipulate to the DNA sample and indicated they would "figure out how we're going to present that to the jury down the road."  *Trial Transcript II* at 3.  I have been unable to locate any written or transcribed DNA (or other) stipulation.  I noted that the jury instructions were not transcribed so, if any stipulations were read to the jurors before the instructions, they will not show in the record before me.  That said, I believe that the record ***does*** accurately reflect how counsel decided to handle the fact that the defense stipulated – he did so by only mentioning it to the trial judge.  Thus, when the topic of the DNA samples came up during testimony, the witnesses mentioned nothing about how they were collected and simply noted that they compared "known valid" samples of the murder victim and Petitioner.  *See, e.g., Trial Transcript Vol. V* at 88; *see also Trial Transcript Vol. VI* at 30.  Not highlighting the stipulation was advantageous to the defense because it allowed the defense to challenge the DNA analytical procedures (discussed in text above), without risking sounding like it was contradicting itself or opening the door to the source of Petitioner's sample.

[21]  *See also Trial Transcript Vol. VI* at 108 ("I had to alter or manipulate the plate to get the most information out the sample that I had. . . . I combined, I did not use off-scale data."); *See, e.g., Trial Transcript VII* at 71-72 (defense closing concerning cross-examination of Ms. Manogue:  "I want to talk about the DNA . . . the State gives you these nice, pretty diagrams and charts . . . but they fail to tell you it took quite some doing to get there.  Five runs, six, runs . . . she manipulates this, puts a little, takes a little out, dilutes, undilutes.").

the victim's.  *See id.* at 113-20.[22]

   Likewise, I have found no concession during trial or in the written record that the State

withheld a CD containing photographs.  To the contrary, it is plain that defense counsel had all

of the photographs and used them to try and persuade the jurors that the evidence at the scene

was contaminated.  Indeed, defense counsel used those photographs to show and argue that, by

taking items out of the bags at the scene and placing them on a tarp that officers walked over,

questions about transfer and contamination of the evidence were in play.[23]

---

[22] For example, this exchange between defense counsel and the witness took place:
> Q.  So if a 13 were to show up in one of your tests, it wouldn't necessarily mean that it was [Petitioner] as contributor, because it could have been there already with the 13/15 from [the victim]?
> A.  That's possible, yes."
> Q.  . . . it is difficult to read but [the victim has] alleles 8 and 10, and [Petitioner] has 8 and 12?
> A.  Okay.
> Q.  So if you see an 8 in the result of one of your tests, it is not necessarily indicative by itself that [Petitioner] would have been a contributor?
> A.  That's correct.
> Q. . . . we would expect Mr. Hogan's DNA to be on his fingernail, right?
> A.  That's correct.
> Q.  So you're looking for something different?
> A.  Yes.
> Q.  But of the four regions you made your call on, [the victim] and [Petitioner] are the same DNA types at one region, and two others [the victim's] DNA would mask [Petitioner's] DNA, so you cannot tell if it is [Petitioner]?
> A.  That's correct.  He is masked at areas, and thus the reason for calculating the particular statistics we did.

*Trial Transcript Vol. VI* at 115-15.

[23] The trial transcript and exhibit list documents that defense counsel received the photographs. *See, e.g., Trial Transcript Vol. II* at 57 (700 to 100 photographs taken); *id.* at 59-60 (photographs represent multiple shots of same thing); *id.* at 147 (defense cross-examination using its own copies of photographs – "I've got some photographs, too, Detective.  I hope I don't duplicate what the State has done, but there's been so many photographs, I just want to ask you some questions."); *id.* at 147-56 (but one example of cross-examination by defense with photographs regarding transfer and cross-contamination); *Record Proper* at 218-20 (exhibit list showing numerous photographs introduced by the State and the defense; State's Exhibits 1, 3-4, 11-29, 32-37, 39-51, 63-103, 117-19, 125; Defense Exhibits A-C, E-CC, EE-MMM).  It also reflects that trial counsel raised no discovery issues before trial.  There are no discovery motions by trial counsel after he entered his appearance – the only motions he filed

Finally, the record does not support the overstated significance Petitioner attributes to the allegedly missing hammer and x-rays showing a "rectangular" skull injury and missing plastic. Medical forensic pathologist Dr. Ian Paul testified that he noted the duct-tape around the husband's head, but concluded the cause of death was "blunt force injuries of the head, resulting in "significant skull fractures, bleeding on and around the brain [and] contusions of the brain." *Trial Transcript Vol. V* at 74.  These injuries alone "were sufficient to cause death."  *Id.* at 77. As such, he did not list asphyxiation as a contributing cause of death on the death certificate.  *Id.* At trial, the prosecution introduced two potential murder weapons – what I will call a "club" and the "granite."  The club was found in one of the bags found near the wall.[24]  Dr. Paul testified that if used with "significant force," it would have left the "semi-lunar" contusions found on the husband's skull.  In addition to photographs and diagrams of the injuries, Dr. Paul testified about the x-rays that were used to show that the husband had not been shot in the head.  *See Trial Transcript Vol. V* at 71-77; *see also id.* at 59-85 (various exhibits introduced or referred to during Dr. Paul's testimony); *Record Proper* at 219-20 (State's exhibits 6 (club), 91-93, 95, 97-103 (photographs), 121-24 (diagrams), and 128-29 (x-rays).

---

before trial were for an extension to prepare, to dismiss the indictment, and motion in limine.  *See, e.g., Record Proper* at 134 ("An extension of time . . . is necessary because the respondent is now on his fourth attorney, Mark Earnest.  The State and Mr. Earnest are in contact and working amicably on this case. Given the complexity and large amount of evidence and number of witnesses in this case, it is expected the Mr. Earnest will need considerable time not only to familiarize himself with the case, but also to interview witnesses and review discover in order to develop a theory of, or position ion the case. . . . none of the above matters could be resolved prior to the current rule date."); *id.* at 156 (motion to dismiss); *id.* at 195 (motion in limine).  No discovery matters were discussed at the hearing prior to voir dire, either.  *See generally Trial Transcript Vol. I.*

[24]  It is State Exhibit 6 and is variously referred to as a "club", *Trial Transcript Vol. II* at 44-45 (surviving victim's description); a "wooden table leg," *Trial Transcript Vol. IV* at 39 (the label the officers gave it when they retrieved it from the bag and logged it into evidence); and a "long and round object," like a "table leg," *Trial Transcript Vol. V* at 71- 74 (Dr. Paul's testimony).

The prosecution also introduced into evidence the granite that was found in the garage.  It was described as different things, but plainly was rectangular in shape.[25]  While it does not translate entirely as clearly in transcript form as it did when Dr. Paul testified using photos and diagrams, his testimony clearly demonstrates that he believed either the club *or* the granite could have made the contusions found on the husband's head.  *See Trial Transcript Vol. V* at 71 (describing one of the injuries as rectangular-shaped); *id.* at 73 (having been shown the pieces of granite in State's Exhibit 113, "any of these pieces of granite would generate enough force to cause the injuries that you saw in that photo").

Also, in cross-examining Dr. Paul, among other things defense counsel asked about the top portion of husband's skull, which was not encased in plastic and had no blood spatter on it, as would have been expected.  *See id.* at 78.  This line of questioning was designed to establish that the husband was deceased **before** his head was encased in plastic and duct tape.  *See id.* at 78-81.  After defense counsel opened this door, on redirect examination the prosecutor asked if it was "possible" that the perpetrator wrapped the club in plastic, thereby leaving no blood spatter on the exposed crown of the skull.  The doctor responded that he was not aware whether there in fact was plastic wrapping the club, because he had never personally seen the club before his testimony, but that it was "possible" there was no visible blood spatter on the crown because the club was wrapped.  *Id.* at 82-83.

### 4.  The Assertions Do Not Amount To A Constitutional Violation

Aside from the lack of support in the record, none of Petitioner's assertions amount to a

---

[25]  *See Trial Transcript Vol. IV* at 71 ("That's a broken piece of black, I believe it was marble granite.  I'm not sure what it was, that natural stone."); *id.* at 84-85 (admission of State Exhibit 113 – "broken pieces of black tile . . . granite"); *Record Proper* at 219 (State's Exhibit 113 - "granite").

constitutional violation under due process generally or under the *Brady/Youngblood* line of

cases.  Petitioner's assertions suggest four failures on the part of the State:

> (1) the State's failure to "conduct tests" on the evidence in its possession (the hammer for DNA and fingerprints on the truck and in the victims' house, and the plastic wrapped around the club);
>
> (2) the State's failure to disclose "exculpatory" evidence (the hammer and the female alibi witness)
>
> (3) the State's failure to "preserve" evidence it had in its possession at one time (the hammer, the fingerprints on the truck and in the victim's house, and the plastic wrapped around the club);  and
>
> (4) the State's "fabrication" of evidence (allowing cross-contamination of items from Petitioner's truck with other evidence at the scene, and the procedures used to analyze Petitioner's DNA sample).

He also asserts that prison officials confiscated copies of evidence Petitioner had in his cell.

No clearly established Supreme Court precedent requires the State to conduct tests of the

evidence in its possession.

> Although the New Mexico Court of Appeals did not cite federal law, its conclusion that the prosecution had no obligation to conduct a DNA analysis is consistent with federal law.  The Supreme Court has stated that "the police do not have a constitutional duty to perform any particular tests." *Arizona v. Youngblood*, 488 U.S. 51, 59 (1988); *see also Riggs v. Williams*, 87 F. App'x 103, 106 (10th Cir. 2004) ("[P]etitioner has offered no legal authority to support his claim that the police had a duty to test the shoes [for blood], and *Youngblood* supports the opposite conclusion."); *United States v. Marrero*, 904 F.2d 251, 261 (5th Cir. 1990) ("*Brady* . . . does not place any burden upon the Government to conduct a defendant's investigation or assist in the presentation of the defense's case."); *United States v. Johnson*, No. 07-40012-01-SAC, 2007 WL 1651302, at *7 (D. Kan. June 6, 2007) ("[D]efendant has no constitutional right to have DNA testing done prior to trial.").  Thus, the appellate court's decision is neither contrary to, nor an unreasonable application of, clearly established federal law.

*Armijo v. Tapia,* CIV 07-1066 JH/WPL (Doc. 26 at 8), *aff'd,* 288 Fed. App'x 530, 533-34 (10th

Cir. 2008).  Nor is there any Supreme Court precedent (much less clearly established precedent)

holding confiscation of materials a prisoner may have collected in his cell during a criminal trial

comes within the purview of the *Brady/Youngblood* line of cases for the purposes of the **criminal**

proceedings.[26]  Thus, Petitioner's first and last points afford no basis for habeas relief.

The evidence Petitioner cites as "exculpatory" does not meet the definition of that word

under the *Brady* line of cases, where due process is violated when the prosecution fails disclose

information in its possession that is "favorable" to the defendant and "material" to either guilt or

punishment.  *United States v. Padilla,* 2010 WL 4337819 at *4 (D.N.M. 2010) (opinion by

presiding District Judge James O. Browning).  Evidence is not "material" unless it "'could

reasonably be taken to put the whole case in such a different light as to undermine confidence in

the verdict.'"  *Id.* at *5 (quoting *Cone v. Bell,* ___ U.S. ___, ___ , 129 S. Ct. 1769, 1783 (2009),

which itself quotes *Kyles v. Whitley,* 514 U.S. 419, 435 (1995)); *see also Kyles*, 514 U.S. at 34

(evidence need not have resulted in acquittal).  None of the evidence was "material" because,

even if all of it had be introduced, that evidence would not have put the case in a "different" light

from which it was presented to the jurors, much less undermine a jurist's confidence in the

jurors' verdict.

From the discussion above,  Petitioner's claims of "fabrication" and "tampering" have no

support in the record.  Moreover, the theory that someone else could have committed the crime

and that cross-contamination had occurred with the evidence was central to the defense theory

and heard by the jurors.  It was obvious that plenty of strangers went through the victims' home

---

[26]  While some courts have held that *Brady* applies to evidence gathered for prison **disciplinary**
proceedings, the Tenth Circuit is not among them.  *Compare Godlock v. Fatkin,* 84 Fed. App'x 24, 28-29
(10th Cir. 2003) ("Although this Circuit has not held that Brady is applicable to prison disciplinary
hearings, we need not decide that issue today"), *with, e.g., Herrera v. Davis,* 54 Fed. App'x 861, 863 (7th
Cir. 2002) ("the Brady rule applies in prison disciplinary proceedings") (citing *Chavis v. Rowe,* 643 F.2d
1281, 1286 (7th Cir.), *cert. denied,* 54 U.S. 907 (1981)).

in the weeks before the murder because of the renovations.  Accordingly, that Petitioner's truck or the victims' house may have contained the DNA or fingerprints of other people would not have added a different component to the case.

That someone saw Petitioner driving his truck around the time of the murder harms, rather than helps the defense, because there was no question Petitioner's truck was in the neighborhood – it was parked in the street and almost hit by the officers speeding by it.  Since the truck never left the view of the police after it was discovered, if someone saw Petitioner driving in the truck around the time of the murder, it would be strong circumstantial evidence that Petitioner drove the truck to the scene of the crime.

Finally, the risk of testing every single piece of physical evidence, or insisting that it be done, could have resulted in a windfall for the State by giving it even more physical evidence tying Petitioner to the crime.  That possibility would have destroyed defense counsel's ability to argue that is it not the defense burden to present evidence, and what little the State chose to present did not prove the case beyond a reasonable doubt.  Similarly, the bloody hammer Petitioner says *may* contain someone else's DNA and *may* fit the pattern of injuries is utter speculation and would not have insulated Petitioner from the murder charge even if it proved to be the case.  Nor does this assertion put the case in a "different light."  At best, because DNA evidence already linked him to the crime scene and the deceased victim, the hammer evidence would simply suggest that someone else committed the murder with Petitioner.  But under New Mexico law, that would not have "exculpated" Petitioner because both parties would be equally culpable of murder, regardless of which of them delivered the fatal blow:

> In New Mexico, "A person may be charged with and convicted of the crime as an accessory if he procures, counsels, aids or abets in its commission and although he did not directly commit the crime and although the principal who directly committed such

> crime has not been prosecuted or convicted. . . ."   NMSA 1978, § 30-1-13 (1972).   A
> person who aids or abets in the commission of a crime is equally culpable as the
> principal.   *State v. Nance,* 77 N.M. 39, 46-47, 419 P.2d 242, 247 (1966).   Aiding and
> abetting is not a distinct offense and it carries the same punishment as a principal.   *Id.*
> at 47, 419 P.2d at 247.

*State v. Carrasco,* 124 N.M. 64, 68, 946 P.2d 1075, 1079 (N.M. 1997).

To the extent Petitioner argues that the State failed to preserve the hammer, any

fingerprints on the truck and in the victim's house and the plastic wrapped around the club, these

"nonexculpatory," but perhaps "potentially useful" pieces of evidence will not support habeas

relief unless Petitioner establishes "bad faith."[27]   However, the "'inquiry into bad faith 'must

necessarily turn on the police's knowledge of the exculpatory value of the evidence'" and  "the

'mere fact that the government controlled the evidence and failed to preserve it is by itself

insufficient to establish bad faith.'"   *Crosby,* 599 F. Supp. 2d at (quoting *Riggs,* 87 Fed. Appx. at

106).   At most, that is what Petitioner's assertions raise.

For all these reasons, I cannot conclude that the state court's rejection of the prosecutorial

misconduct claims were "contrary to" or an "unreasonable application" of clearly established

Supreme Court law, or that any "unreasonable" factual conclusions were drawn in rejecting

them.

## D.  Ineffective Assistance Of Counsel Claims

Petitioner raises some thirteen ineffective assistance of counsel claims, most of which stem

---

[27]   *E.g., Russell v. Watkins,* 112 Fed. App'x 721, 723 (10th Cir. 2004) ("Mr. Russell alleges that
the evidence relating to latent finger prints, palm prints, and a hammer was material to his guilt and
should have been presented to the state court.  This evidence, however, does not possess the exculpatory
value required by *Brady.*  Instead, the evidence is more properly categorized as "potentially useful." . . .
Because the exculpatory value of this evidence was not apparent before it was destroyed, establishing a
due process claim requires showing bad faith on the part of the police in their failure to preserve such
evidence.").

from the noncognizable claims or other claims rejected above.  As previously noted, many of the claims were raised on direct appeal but not addressed, and they were all raised in the state postconviction proceedings and rejected summarily on the merits.

Respondents correctly note in their Answer that recent Supreme Court decisions emphasize AEDPA review under the two-prong *Strickland* test for ineffective assistance of counsel claims is highly deferential.  *See Doc. 9* at 7; *see also Strickland v. Washington,* 466 U.S. 668 (1984).  Indeed, the Supreme Court reemphasized the deference *Strickland* requires in its *Harrington* decision.  *Strickland* sets a "high bar" for petitioners to surmount, and the habeas court's review, **"[e]ven if de novo . . . is a most deferential one."**  *Harrington,* 131 S. Ct. at 788 (emphasis added).  In *Harrington* and other recent decisions, the Supreme Court also emphasizes the interplay between the "highly-deferential" *Strickland* standard and the deference imposed by Congress under the AEDPA standards:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult.  The standards created by *Strickland* and § 2254(d) are both "highly deferential," . . . and when the two apply in tandem, review is "doubly" so . . . .  The *Strickland* standard is a general one, so the range of reasonable applications is substantial. . . .  Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.*[28]

---

[28]  *See also, e.g., Premo v. Moore,* ___ U.S. ___, ___, 131 S. Ct. 733 743 (2011) ("Moore's counsel made a reasonable choice to opt for a quick plea bargain.  At the very least, the state court would not have been unreasonable to so conclude.") (citing as analogous, *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004), for the proposition that it explains "state courts enjoy 'more leeway' under AEDPA in applying general standards"); *Allen v. Lawhorn,* ___ U.S. ___, ___, 131 S. Ct. 562, (2010) ("As we have repeatedly explained, AEDPA imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt. . . .  The doubt of which the Alabama Court of Criminal Appeals was to be given the benefit was particularly expansive in this case, since none of our cases has ever considered whether the failure to give a closing argument can be

If there is "no Supreme Court precedent establishing the [ineffectiveness] rule" that a petitioner asserts, then a federal habeas court "retreats to the general [two-prong] *Strickland* standard." *Crawley v. Dinwiddie,* 584 F.3d 916, 921-22 (10th Cir. 2009) (citing *Knowles v. Mirzayance,* 556 U.S. ___, ___, 129 S. Ct. 1411, 1419 (2009), *rehearing denied sub nom. In re Word,* 129 S. Ct. 2422 (2009)), *cert. denied,* 130 S. Ct. 3357 (2010).  That is the case here with each of Petitioner's claims.  That is, Petitioner must show counsel's conduct was constitutionally deficient and that, but for the conduct, the result of the proceeding would have been different.[29]

_____

considered prejudicial under *Strickland.*  Accordingly, only the standard for ineffective assistance set forth in *Strickland* itself could be applied; and as we have explained, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard. . . .  [T]he more general the rule at issue-and thus the greater the potential for reasoned disagreement among fair-minded judges-the more leeway state courts have in reaching outcomes in case-by-case determinations.") (internal quotations and citations omitted) (citing, among other recent cases, *Renico,* 130 S. Ct. at 1862 (2010), *Knowles v. Mirzayance,* 556 U.S. ___, ___, 129 S. Ct. 1411, 1420 (2009), and *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007)).

The Supreme Court has not yet resolved the relationship between the AEDPA provision presuming facts found by state courts to be correct, and the AEDPA standard precluding habeas relief unless the state court decision was an unreasonable determination of the facts.  *See Wood v. Allen,* ___ U.S. ___, ___, 130 S. Ct. 841 (2010).  In *Wood,* the Supreme Court granted certiorari "to resolve the question of how §§ 2254(d)(2) and (e)(1) fit together," but later found that it "need not reach this question."  *Wood* 130 S. Ct. at 849.  Thus, it remains unsettled whether the presumption of correctness under § 2254(e)(1) applies to fact-based findings the state court made on the trial record, or whether it applies only where the state factual finding was based on extrinsic evidence introduced in state proceedings after trial, or some other variation of these factors.  *See id.* at n.2.  *Wood* and other recent decisions do make it plain, however, that *Strickland* issues of trial counsel's strategy can present questions of "clearly established law" under § 2254(d)(1) and "reasonableness of determinations of fact" under § 2254(d)(2).  *See id.* at 851.  Tenth Circuit and other decisions make it plain that"basic, primary, or historical facts," but not mixed questions of law or fact, are subject to the presumption of correctness in the same way they were pre-AEDPA.  *See, e.g., Thompson v. Keohane,* 516 U.S. 99, 109-112 (1995); *Lancaster v. Adams,* 324 F.3d 423, 429 (6th Cir.), *cert. denied,* 540 U.S. 1004 (2003); *Herrera,* 225 F.3d at 1178-79; *Gutierrez v. Dorsey,* 105 Fed. App'x 229, 230 (10th Cir.), *cert. denied,* 543 U.S. 1010 (2004).

[29]  "To establish deficient performance, a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness."  *Harrington,* 131 S. Ct. at 787 (internal quotations and citations omitted).  That conduct must amount to "errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment."  *Id.* (same).  The question is not whether counsel's conduct "deviated from best practices or most common custom," but whether "an attorney's representation amounted to incompetence under prevailing professional norms." *Id.* at 788 (same).  In considering the first *Strickland* prong, this Court must not succumb to the temptation to "second-guess counsel's assistance after conviction or adverse sentence." *Id.* (same).

Failure to make either showing defeats the claim.  *E.g., Smith v. Robbins,* 528 U.S. 259, 285-86 & n.14 (2000); *Strickland,* 466 U.S. at 687.  One fundamental principle for analyzing *Strickland* claims is that trial and/or appellate counsel are not ineffective for failing to raise meritless arguments.  Neither *Strickland* prong is met in that instance.  *E.g.,  Smith v. Workman,* 550 F.3d 1258, 1268 (10th Cir. 2008) (focusing on claims concerning appellate counsel), *cert. denied,* 130 S. Ct. 238 (2009); *Wimbley v. Werholtz,* 187 Fed. App'x 840, 846 (10th Cir. 2006) (focusing on claims concerning trial counsel and citing *United States v. Cook,* 45 F.3d 388, 393 (10th Cir. 1995)).  No Supreme Court decision holds or clearly establishes otherwise.  *See Smith,* 528 U.S. at 288 ("[A]ppellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal.").  That is also the case with several of Petitioner's claims.

## 1.  Failure To File Writ Of Prohibition Re:  Grand Jury Instructions

Petitioner believes that the grand jury was not properly instructed on the elements of kidnapping and that if defense counsel had pursued the matter fully, the State could not have prosecuted him for murder:

> Defense counsel failed to timely petition the State Supreme Court for an extraordinary writ of prohibition concerning the failure to properly instruct the grand jury of the elements of kidnapping. ***This failure was identified in the Court's opinion in his case***. Had counsel correctly followed the law and prosecuted the extraordinary writ, the . . . ***district court would have been divested of in personam jurisdiction to proceed with the criminal prosecution.  No trial could have occurred.***  Counsel has an obligation to actually know and follow that laws of the case at bar.

---

To establish prejudice, Petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," and a "reasonable probability" means "a probability sufficient to undermine confidence in the outcome." *Id.* at 787 (same).  "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* (same).  Instead, "[c]ounsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 787-88 (same).

*Doc. 1* at 20-21 (emphasis added).  Counsel did challenge the grand jury instructions by filing a motion to dismiss before trial, which was denied.  *See Doc. 9-2* at 2, 16-20.  On direct appeal, the New Mexico Supreme Court acknowledged there was a potential "serious" issue with grand jury instructions because of the factors that raise kidnapping from a second degree felony to a first degree felony.[30]  However, it declined to reach the merits of the claim because, like the *Mechanik* principle that bars federal review of the grand jury claim, under its decision in *Ulibarri,* the grand jurors' decision on probable cause was obviated by the petit jury's guilty verdict.  *See Gallegos,* 146 N.M. at 94, 206 P.3d at 999.

Petitioner's belief that if the New Mexico Supreme Court would have granted the writ of prohibition then the State could not have prosecuted him, is incorrect as a matter of state law.  I will assume for the purposes of discussion that on a timely writ of prohibition, the New Mexico Supreme Court would have found the grand jury instructions erroneous ***and*** that the error warranted dismissal of the indictment.  Even so, state law does not require that such dismissals be made with prejudice.  The *Ulibarri* decision itself noted to the contrary, holding that a dismissal for failure to comply with state "grand jury statutes and rules are ***of necessity without*** prejudice."  *Ulibarri,* 128 N.M. at 687, 997 P.2d at 819 (emphasis added, internal quotations to Court of Appeals' decision omitted).  This would have only prohibited the "matter  from proceeding to trial ***on the present indictment***."  *Davis v. Traub,* 90 N.M. 498, 501, 565 P.2d 1015, 1018 (N.M. 1977) (emphasis added).  Indeed, even a dismissal where the prosecutor

---

[30]  Under the New Mexico kidnapping statute the basic elements only constitute a second-degree felony and special verdict form is used to determine whether statutory factors are present that raise the crime to a first-degree felony.  *Gallegos,* 146 N.M. at 93, 206 P.3d at 998.  The Court stated that because "it is the State's burden to prove the elements contained in the special verdict form in order to obtain a conviction for first-degree, rather than second-degree, kidnapping," it is "not unreasonable to expect the State to establish probable cause for the same elements at the grand jury stage."  *Id.*

withheld potentially exculpatory evidence from a grand jury was made without prejudice. *See State v. Herrera,* 93 N.M. 442, 443, 601 P.2d 75, 76 (N.M. App. 1979) (affirming dismissal "without prejudice to the matter being again presented to the grand jury"), *rev'd in part, Buzbee v. Donnelly,* 96 N.M. 692, 701, 634 P.2d 1244, 1253,(N.M. 1981) (state statute does not require prosecutor to present circumstantial exculpatory evidence to grand jury, only direct exculpatory evidence).

Thus, the ineffectiveness claim fails on the prejudice prong alone because the result Petitioner thinks he would have achieved would not have materialized. This also provides a strategic reason why defense counsel would be loathe to prolong the proceedings, particularly when his client was insisting on a speedy trial, *see Record Proper* at 177, 186 (*pro se* motions for speedy trial after trial counsel entered his appearance in the case), for something that would ultimately be no benefit to the defense. Accordingly, the claim fails on the deficient conduct prong as well.

## 2.  Failure To Challenge The Verdicts

Some of these claims are difficult to decipher. When read together, they are a bit more clear, so I discuss them together. For the reasons above, the evidence was sufficient for the jurors to find that he possessed a firearm and Petitioner's *Apprendi* claim is utterly frivolous. Thus, the separate but associated ineffectiveness claim fails as well. *See Doc. 1* at 22

Petitioner also asserts that willful and deliberate murder and felony murder have "different elements" – the former "requires a finding of fact by the jury of the Defendant's state of mind" where as "[f]elony murder does not have this requirement [and] requires a different finding of fact by the jury, whether a felony was committed as a part of the murder." *Doc. 1* at 15. He contends that there was "no unanimous" finding of fact by the jury for either crime." *Id.* That

alleged lack of unanimity, he claims, made the verdicts "conflicting" and violates due process. *See id.*  As such, he also claims that counsel was ineffective for failing to challenge the "conflicting" verdicts at trial or on direct appeal.  *See Doc. 1* at 21.

Petitioner is correct that first-degree murder and felony murder have different elements. The jury was instructed on those different elements.  First degree murder requires the killing be done "with the deliberate intention to take away life."  *Record Proper* at 222.  "Deliberate intention" was defined in detail as well.  *Id.*  Felony murder requires that the death be causes while committing either kidnapping, false imprisonment, armed robbery, or aggravated burglary. *Id.* at 231.  It could be done either with the knowledge that the acts "created a strong probability of death or great bodily harm" *__or__* with "inten[t] to kill."  Either state of mind would suffice for felony murder.  *Id.*  The jury verdicts reflect that they found him guilty of "First Degree Murder by a deliberate killing," *id.* at 262, and felony murder, *id.* at 266, and kidnapping of both victims, *id.* at 268, 271, aggravated burglary with a deadly weapon, *id.* at 274, and armed robbery, *id.* at 278.  There is nothing "inconsistent" with a willful and deliberate murder having been committed while a perpetrator was also committing another felony.

There was a bit of confusion about the alternative verdicts on murder and aggravated burglary because some of the special verdict forms were not signed while others contained slashes through them.  *See id.* at 262, 274, 276.  But that did not make the verdicts less than unanimous.  The trial judge asked a clarifying question with a note, sent the forms back to the jurors, and within minutes they returned their verdict.  *See Transcript Vol. VIII* at 10-12.  The judge read aloud into the record and in the presence of the jury what their clarified verdict forms reflected for each count, including that the jury found Petitioner both "'guilty of first-degree murder by deliberate killings as charged in Count 1'" and "guilty of first-degree felony murder

as charged in the alternative to Count 1.'" *Id.* at 12.  Thereafter the trial judge polled all of the

jurors, each of whom indicated those verdicts were their true verdict.  *Id.* at 15-17; *see also State*

*v. Apodaca,* 123 N.M. 372, 377-79, 940 P.2d 478, 483-85 (N.M. App. 1997) (judge entitled to

satisfy that verdict is unanimous, and alternatives include sending jurors back for more

deliberations and by polling jurors).[31]  Thus, the "inconsistency/unanimity" claim, and the

associated ineffectiveness claim affords no basis for habeas relief.

Two of Petitioner's claims invoke the phrase "double jeopardy."  In Ground Seven,

Petitioner believes he received a "life sentence" for "felony murder" and the trial judge

"imposed all other sentences."  Petitioner argues that

> [a]t least one of the other sentenced crimes must be vacated.  This [is] because at least
> one other sentence is a predicate act for felony murder.  This had to have been
> determined by the jury and was not.  No double jeopardy instructions given to the jury.
> Compare State v. Herron.

*Doc. 1* at 15.  In his state petition for this claim, he cited  "Swafford v. State" and "North

Carolina v. Pearce."  *Doc. 9-4* at 8; *see North Carolina v. Pearce,* 395 U.S. 711, 717 (1969)

("guarantee against double jeopardy . . . protects against a second prosecution for the same

offense after acquittal . . . protects against a second prosecution for the same offense after

conviction . . . protects against multiple punishments for the same offense"); *Swafford v. State,*

112 N.M. 3, 7, 810 P.2d 1223, 1227 (N.M. 1991) (same, citing *Pearce*); *Herron v. State,* 111

---

[31]  The jury instructions were similarly marked, including slashes forming an "x" through the
instruction for felony murder.  *Record Proper* at 237.  The "x" is followed the note to "disregard" and
illegible initials.  *Id.*  Other instructions contain similar slashes or strike outs for the alternative verdicts
on which they did not find guilt as do the verdict forms for those counts.  Others reflect the jurors'
unanimity on each element of the offenses for which they convicted.  *See id.* at 222-57.  Because the
instructions bear markings clearly related to the jurors' decision, and because it is also clear from the
transcript that felony murder was submitted to the jurors as an alternative to the murder count, I conclude
that the trial court failed to preserve a clean copy of the final jury instructions to put into the record, and
used the jurors' copy for this purpose.

N.M. 357, 361, 805 P.2d 624, 628 (1991) (among other things, discussing application of the rule

of lenity in double jeopardy cases).  In Ground Nine, he continues the subject of double jeopardy

and his sentencing:

> Defense counsel failed to object to the failure to correctly instruction the jury concerning
> double jeopardy.  Without the correct jury instructions, the Petitioner was deprived of
> jury fact finding as to what felony is the predicate act for felony murder.  This would
> also identify what felony could not receive a separate sentence.  Had counsel objected
> and proffered the correct instructions, the jury would have decided the facts of the case.

*Doc. 1* at 21; *see also Doc. 9-4* at 13.  However,

> "jurors [generally] are not informed of mandatory minimum or maximum sentences, nor
> are they instructed regarding probation, parole, or the sentencing range accompanying
> a lesser included offense." . . .   "The jury's function is to find the facts and to decide
> whether, on those facts, the defendant is guilty of the crime charged." . . .  In this case,
> the jury made a factual finding that Neely was GBMI of first-degree murder.  The New
> Mexico legislature, not the jury, determined the appropriate sentence.  We therefore
> reject Neely's argument that the jury . . . should have been instructed on the
> consequences of the possible verdicts.

*Neely v. Newton,* 149 F.3d 1074, 1085 (10th Cir. 1998) (quoting *Shannon v. United States,* 512

U.S. 573, 579, 586-87 (1994)), *cert. denied,* 525 U.S. 1107 (1999).  Here, the jurors were

properly instructed not to be concerned with the consequences of their verdicts.  *See Record

Proper* at 229. Counsel, therefore, cannot be faulted for not tendering instructions on the

consequences of their verdict, nor was Petitioner prejudiced in any way.  Thus, the

ineffectiveness aspect of this claim fails.

 I believe that Petitioner is attempting to argue, particularly with his citations to *Swafford*

and *North Carolina,* that because he was convicted of the offenses and felony murder, he cannot

receive an additional sentence for the underlying crimes because that would violate the double

jeopardy prohibition of multiple punishments for the same offense.  Even if he is correct as a

matter of state law, he is not entitled to federal habeas relief.

Petitioner was sentenced to life on the felony murder count, but that merged with his life sentence for first-degree deliberate murder. *See Record Proper* at 303. He received various other sentences for the felonies of: kidnapping the husband (Count 2); kidnapping the wife (Count 3); burglary aggravated due to the commission of a battery (Count 4); armed robbery (Count 5); battery aggravated by the use of a firearm (Count 6); and tampering with evidence (Count 7). Typically, the *Blockburger* test is cited for double jeopardy purposes. *BLOCKBURGER* employs a comparison of the "elements" test. Thus, where one of the crimes at issue requires proof of an element that the other does not, then double jeopardy is not violated. The ultimate inquiry, however, is what the New Mexico legislature intended by the felony murder statute.[32]

If the *BLOCKBuRGER* elements test were the "clearly established law" for AEDPA purposes, it would be an easy application and denial of relief because all of the crimes have different statutory elements and would not violate double jeopardy. But I have found no case, and certainly not any binding authority, that defines the AEDPA clearly established law that way. In fact, the law in this area remains murky. The contours of the proper test and/or how *BLOCKBuRGER* should be applied is not well-settled. The Supreme Court itself has so

---

[32] *See Albernaz v. United States,* 450 U.S. 333, 344 (1981) ("[T]he question of what punishments are constitutionally permissible is not different from the question of what punishments the Legislative Branch intended to be imposed"); *Whalen v. United States,* 445 U.S. 684, 688 (1980) ("[T]he question whether punishments imposed by a court after a defendant's conviction upon criminal charges are unconstitutionally multiple cannot be resolved without determining what punishments the Legislative Branch has authorized"); *Blockburger v. United States,* 284 U.S. 299, 304-05 (1932) ("Each of the offenses created requires proof of a different element. The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. . . . The plain meaning of the provision is that each offense is subject to the penalty prescribed; and, if that be too harsh, the remedy must be afforded by act of Congress, not by judicial legislation under the guise of construction.").

indicated:

> the simple-sounding *BLOCKBuRGER* test has proved extraordinarily difficult to administer in practice.  Judges, lawyers, and law professors often disagree about how to apply it. . . .  The test has emerged as a tool in an area of our jurisprudence that the Chief Justice has described as "a veritable Sargasso Sea which could not fail to challenge the most intrepid judicial navigator." . . .  Yet the Court now asks, not the lawyers and judges who ordinarily work with double jeopardy law, but police officers in the field, to navigate BLOCKBuRGER when they question suspects. . . .  Some will apply the test successfully; some will not.  Legal challenges are inevitable.  The result, I believe, will resemble not so much the Sargasso Sea as the criminal law equivalent of Milton's "Serbonian Bog . . . Where Armies whole have sunk."

*Texas v. Cobb,* 532 U.S. 162, 185-86 (2001) (Justices Breyer, Stevens, Souter, and Ginsberg, dissenting).  Complicating the matter is the fact that a federal habeas court would be bound by New Mexico state court decisions that apply the *Blockburger* test and decide legislative intent for a particular statute.[33]  However, the New Mexico state decisions have been in flux and recently the New Mexico Supreme Court reversed course in the area of felony murder convictions and underlying felonies.  *See, e.g., State v. Garcia,* ___P.3d ___, 2011 WL 438934 at **11-12 (N.M. 2011); *Kersey v. Hatch,* 148 N.M. 381, ___, 237 P.3d 683, 686-91 (N.M. 2010).

For the purposes of this case, I need not wade far into these morasses.  No Supreme Court decision clearly establishes that imposing sentences for any of these New Mexico crimes in

---

[33]
> We review a habeas petition alleging multiple punishment double jeopardy only to determine whether the state trial court imposed a sentence greater than the legislature intended.  *Missouri v. Hunter,* 459 U.S. 359, 368 (1983).  "'[W]e are bound by a state court's determination of the legislature's intent.'"  *Cummings v. Evans,* 161 F.3d 610, 615 (10th Cir. 1998) (quoting *Birr v. Shillinger,* 894 F.2d 1160, 1161 (10th Cir. 1990)).  Thus, "if the highest state court determines that the legislature intended to punish separate offenses cumulatively, a federal habeas court must defer to that conclusion."  *Id.* at 615.

*Spradling v. Addison,* 367 Fed. App'x 938, 941-42 (10th Cir. 2010).

addition to a sentence for felony murder violates double jeopardy.  No Supreme Court decision clearly establishes that a double jeopardy claim concerning the sentences for underlying felonies will survive when the sentence for felony murder sentence itself merges with the clearly separate sentence for the clearly separate crime of first-degree deliberate murder.

As discussed at the outset, under the Tenth Circuit's decision in *Fairchild,* the absence of this clearly established law is completely dispositive of the 2254(d)(1) inquiries.  *Fairchild,* 579 F.3d at 1139; *see also Lambert,* 594 F.3d at 1263 ("Lambert has not cited, nor have we found, any Supreme Court authority clearly establishing the proper reconciliation of the competing double-jeopardy principles at issue here.  Under the AEDPA standards set out above, that is fatal to his claim.  Unless and until the Supreme Court decides that retrial following the reversal of a conviction is barred when a lesser-included offense conviction is simultaneously affirmed, habeas relief on this basis is unavailable, and it is not the province of this court to resolve the issue here.").  Thus, Petitioner cannot secure federal habeas relief on the double-jeopardy sentencing aspect of the claim.

Also, in light of the unsettled state and federal law, and the fact the felony murder sentence merged with the deliberate murder charge, I find that reasonable jurists could certainly disagree whether counsel's failure to raise the double jeopardy sentencing issues concerning the felony murder count was unreasonable or prejudicial.  Accordingly, I cannot conclude the state court rejection of the ineffectiveness aspect of the double jeopardy-sentencing claim was contrary to or unreasonable, either.

### 3.  Failure To "Investigate"

The rest of Petitioner's claims challenge counsel's "failure to investigate" aspects of the case and to bring certain evidence to the jurors' attention.  He makes claims with respect to

-46-

matters already discussed above – that counsel failed to investigate and introduce evidence on:

- how Petitioner's DNA was "altered;"[34]
- the woman alibi witness who saw Petitioner driving;[35]
- the discovery materials confiscated from Petitioner's cell;[36]
- the "withheld" CD containing 1500 crime scene photographs; and[37]

---

[34]

> Defense counsel failed to investigate and know the science of the case. Counsel failed to understand how the state DNA expert altered the Petitioner's DNA to match the alleged crime scene evidence. Counsel failed to retain a forensic CNA expert to explain to the jury that one cannot alter DNA evidence to match other evidence. Had counsel done such, there would have been a clear rebuttal to the State's fraud in the DNA evidence.

*Doc. 1* at 19. The claim was raised on direct appeal. *See Doc. 9-2* at 28 & n. 5 ("Appellant wishes the Court to consider whether he received ineffective assistance of counsel due to this attorney's failure to present a defense by investigating and challenging evidence and by raising various and sundry issues" and in footnote 5 to that sentence "Including . . . DNA expert's manipulation of DNA samples"). It was also raised in the state post-conviction petition. *See Doc. 9-4* at 11.

[35]

> An alibi witness contacted defense counsel. She left a number of messages at counsel's office. Defense counsel did nothing to investigate this witness. This witness saw the Petitioner driving his truck during the time he was allegedly committing the crimes. The failure to investigate and present alibi witnesses is ineffective assistance of counsel pursuant to *Duncan v. Kerby*.

*Doc. 1* at 18l The claim was raised on direct appeal. *Doc. 9-2* at 28 & n. 5 ("Appellant wishes the Court to consider whether he received ineffective assistance of counsel due to this attorney's failure to present a defense by investigating and challenging evidence and by raising various and sundry issues" and in footnote 5 to that sentence "Including . . . newly discovered evidence regarding a witness"). It was also raised in the state post-conviction petition. *Doc. 9-4* at 9-10.

[36]

> Contrary to specific instructions, defense counsel failed to investigate the suppressed discovery evidence. The Petitioner told counsel of the discovery material confiscated by the jail guards. And, the differences between the confiscated discovery and the discovery provided by counsel. Counsel did nothing to correct this problem and the prosecutor's perjury.

*Doc. 1* at 18. This claim was raised in the raised in the state post-conviction petition. *Doc. 9-4* at 10.

[37]

> Counsel did nothing when it was disclosed at trial that the prosecution had withheld a compact disk with over 1500 crime scene photographs. These photographs contain significant exculpatory evidence. Had these photographs been provided and examined, the exculpatory evidence would have produced a different trial outcome. These photographs would prove

  !   the "cross-contamination" and "tampering" with evidence theory.[38]

He makes other similar claims – that counsel failed to investigate and introduce evidence on:

  !   bite wounds on the husband to show that the teeth marks did not match
      Petitioner's or saliva;[39]

---------------

    how the gloves and ski mask became contaminated with the victim's DNA
    evidence. These photographs would show the square edged murder
    weapon. These photographs would show the missing hammer that may
    have been used during the murder.

*Doc. 1* at 19. The claim was raised on direct appeal. *See Doc. 9-2* at 28 & n. 5 ("Appellant wishes the
Court to consider whether he received ineffective assistance of counsel due to this attorney's failure to
present a defense by investigating and challenging evidence and by raising various and sundry issues" and
in footnote 5 to that sentence "Including . . .exculpatory evidence withheld by the State . . . missing police
photos of the scene demonstrating contamination and relocation of the evidence"). It was also raised in
the state post-conviction petition. *See Doc. 9-4* at 10-11.

   [38]

    Contrary to specific instructions, defense counsel failed to investigate the
    State's tampering with evidence. The Petitioner clearly explained to
    counsel where the gloves and ski mask were located in his truck. The
    existence of the Petitioner's fingerprints in his truck were explained.
    Counsel did nothing to learn how these matters of evidence were changed
    by the State. Petitioner explained the merits of 29-14-5 to counsel. And,
    how counsel could cause an internal affair investigation to the crime scene
    investigator's tampering with the evidence. Then how to obtain the
    polygraph results for inclusion and admission at trial. Counsel did nothing.
    Had the polygraph been done on the police tampering with evidence and
    been admitted into evidence, the outcome of the trial would have been an
    acquittal.

*Doc. 1* at 20. The claim was raised on direct appeal. *See Doc. 9-2* at 28 & n. 5 ("Appellant wishes the
Court to consider whether he received ineffective assistance of counsel due to this attorney's failure to
present a defense by investigating and challenging evidence and by raising various and sundry issues" and
in footnote 5 to that sentence "Including . . . possible police evidence tampering regarding fingerprints,
gloves and a ski mask"). It was also raised in the state post-conviction petition. *See Doc. 9-4* at 11-12.

   [39]

    Contrary to specific instructions, defense counsel failed to investigate the
    defensive bite wounds suffered by Hogan during his murder. The murderer
    bit Hogan's hand during the incident. The Petitioner's teeth do not match
    these wounds. The Petitioner' sliva (sic) is not in the wounds. Had counsel
    investigated and caused the Petitioner's bite impression to be taken and
    compared, counsel would have had proof that some other person bit Hogan
    at the time of death. Had counsel investigated, there would be DNA
    evidence that the saliva in Hogan's wound was not from the Petitioner.

! bloody shoe prints found in the garage that did not match Petitioner's feet;[40]
! the surviving victim was a former prosecutor from California, a fact that when coupled with other testing of the physical evidence may have revealed another potential suspect; and[41]

---

This would have altered the outcome of the trial by proving that another person had committed the murder.

*Doc. 1* at 17.  The claim was raised on direct appeal.  *See Doc. 9-2* at 28 & n. 5 ("Appellant wishes the Court to consider whether he received ineffective assistance of counsel due to this attorney's failure to present a defense by investigating and challenging evidence and by raising various and sundry issues" and in footnote 5 to that sentence "Including . . . bite wounds").  It was also raised in the state post-conviction petition.  *See Doc. 9-4* at 9.

[40]

Contrary to specific instructions, defense counsel failed to investigate the shoe prints or impressions made in the victim's blood by the murderer. There was blood splatter all over the garage where Hogan was bludgeoned to death.  The murderer walked through this blood making tracks.

These shoe prints do not match the Petitioner for size or weight. Had counsel investigated, with the necessary expert, counsel would have had proof that some other person made the shoe prints in the victim's blood on the garage floor.  This would have altered the outcome of the trial by proving that another person committed the crime.

*Doc. 1* at 18.  The claim was raised on direct appeal.  *See Doc. 9-2* at 28 & n. 5 ("Appellant wishes the Court to consider whether he received ineffective assistance of counsel due to this attorney's failure to present a defense by investigating and challenging evidence and by raising various and sundry issues" and in footnote 5 to that sentence "Including shoe prints").  It was also raised in the state post-conviction petition.  *See Doc. 9-4* at 9.

[41]

Contrary to specific instructions, defense counsel failed to investigate Carole Hogan.  Carole was a former prosecutor and district attorney from California.  Counsel was instructed to investigate who would want to harm Carole Hogan.  Who had she harmed significantly?  It is common knowledge throughout the criminal/gang community that when one seeks to really harm an enemy, one kills or maims a loved one of the enemy.  Had this investigation been done, a list of potential suspects would have bene obtained.  A comparison of saliva DNA to Hogan's hand wound, of fingerprints and DNA on the missing hammer, and bite mark impressions made to this potential list of suspects would have correctly identified the killer. . . .  Without any review or investigation a computer was confiscated from Carole Hogan and returned.  This may have contained information about this potential suspect group.

*Doc. 1* at 22-23.  This claim was raised in the raised in the state post-conviction petition.  *See Doc. 9-4* at 14-15.

! fraud and corruption in the Albuquerque Police Department evidence room.[42]

He maintains that "*Strickland* held that counsel's failure to investigate is **always** ineffective assistance of counsel" because it "deprives counsel of the necessary facts to make legitimate and meaningful strategic and tactical choices at trial." *Doc. 1* at 24 (emphasis added). This legal assertion is incorrect based on the extensive discussion above of the relevant *Strickland* and AEDPA standards. Also, blanket assertions of failure to investigate do not fall within the *Cronic* alternative to the *Strickland* standards. *See, e.g., Hooks v. Workman,* 606 F.3d 715, 724-25 (10th Cir. 2010). Finally, for the reasons discussed in detail the prosecutorial misconduct section, all of Petitioner's failure to investigate ineffectiveness claims fail, either because they are based on an underlying premise already discussed and found to be meritless, or because they are no different in substance to those premises, or because it is clear that the "law does not require counsel to raise every available nonfrivolous defense." *Knowles,* 129 S. Ct. at 1421 (citing

---

[42]

> Contrary to specific instructions, defense counsel failed to investigate the fraud and corruption of the Albuquerque Police Dept. evidence room. The physical evidence of this case was held in the APD evidence room. During this same time, confirmed acts of tampering with evidence, altered evidence, stolen evidence, and fraudulently manipulated evidence by police were exposed. This corresponds with the two different discovery packets and suppression of evidence issues of this case. A full investigation would have identified the state actors who tampered with the evidence in this case. This would have identified the motives underlying the deceptions. It is difficult to articulate how this investigation would have altered the outcome of the trial. There are too many unknown facts. Alternatively, when one considers the evidence of corruption of the case it is impossible to believe that such an investigation would not have . . . resulted in suppressed evidence or a dismissal of the entire prosecution.

*Doc. 1* at 23-24. This claim was raised in the state post-conviction petition. *See Doc. 9-4* at 15-16  In support of this claim, Petitioner attaches newspaper articles from 2005 that report on problems with the evidence room. *See Doc. 1* at 30-33 ("Freezer Failure My Hurt APD Evidence" - regarding DNA)); *id.* at 34 ("APD Evidence Room Getting It Together" - regarding accusations of theft, losses and cover-ups); *id.* at 35-38 ("Lawyers Duel Over Impact of Lost Evidence" - regarding chemical contamination of the evidence room).

*Jones v. Barnes,* 463 U.S. 745, 751 (1983)).

Wherefore,

**IT IS HEREBY RECOMMENDED** that the § 2255 petition be dismissed with prejudice.

**IT IS FURTHER RECOMMENDED** that no certificate of appealability issue.

> **THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

_____
UNITED STATES MAGISTRATE JUDGE